EXHIBIT "H"

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 217032 (Del.Ch.)
**(Cite as: 2005 WL 217032 (Del.Ch.))**

**C**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
CERTAINTEED CORPORATION, a Delaware corporation
Plaintiff,
v.
CELOTEX CORPORATION, a Delaware corporation,
Plaintiff,
and
CELOTEX ASBESTOS SETTLEMENT TRUST, a Florida
trust Defendants.
**No. Civ.A. 471.**

Submitted Oct. 25, 2004.
Decided Jan. 24, 2005.

William M. Kelleher, Ballard Spahr Andrews & Ingersoll, LLP, Wilmington, Delaware; Harry Weiss, and Monique Mooney, Ballard Spahr Andrews & Ingersoll, LLP, Philadelphia, Pennsylvania, for Plaintiff.

Richard G. Placey, and Richard M. Donaldson, Montgomery, McCracken, Walker & Rhoads, LLP, Wilmington, Delaware; Stephen A. Madva, and David D. Langfitt, Montgomery, McCracken, Walker & Rhoads, LLP, Philadelphia, Pennsylvania, for Celotex Corporation.

R. Judson Scaggs, Jr., and Patricia R. Uhlenbrock, Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware; Daniel J. Donnellon, Keating, Muething & Klekamp, Cincinnati, Ohio, for Celotex Asbestos Settlement Trust.

MEMORANDUM OPINION
STRINE, Vice Chancellor.

*1 Plaintiff CertainTeed Corporation purchased an operating business and several industrial facilities from Defendant Celotex Corporation under an asset purchase agreement. Under the asset purchase agreement, Celotex assumed the obligation to indemnify CertainTeed for certain losses CertainTeed might incur relating to the assets it was purchasing, and more generally, for losses incurred as a result of breach of the asset purchase agreement itself. After

closing, CertainTeed began to experience losses of various kinds that it believed fell within Celotex's contractual duty of indemnification. After complying with the contractual notification procedure and receiving no satisfaction from Celotex, CertainTeed brought this case alleging that Celotex is responsible for these losses.

Celotex has filed a motion to dismiss CertainTeed's claims as time-barred, alleging that: 1) all of CertainTeed's claims accrued as of the August 18, 2000 closing date of the asset purchase agreement; 2) all statutes of limitation that apply (by analogy in equity under the laches doctrine) required a filing within three years of that date; 3) no basis for tolling any limitation period exists; and 4) CertainTeed filed this suit on May 28, 2004, after the applicable limitation periods had expired.

In this opinion, I cannot find as a matter of law that all of CertainTeed's claims accrued at closing and became time-barred on the third anniversary of the closing date. CertainTeed brings three general categories of claims, each of which implicates different principles of claim accrual and tolling.

The first category involves CertainTeed's claims for injuries incurred because some of the acquired facilities' environmental conditions were not as represented and warranted in the asset purchase agreement. Even indulging CertainTeed's argument that these conditions were not discoverable at the time of closing and that the applicable statutes of limitation were therefore tolled, the complaint demonstrates that CertainTeed was on inquiry notice of these claims more than three years before filing this suit. This category of claims is therefore dismissed.

The second category of claims involves allegations that Celotex breached its obligation to perform certain environmental remediation and testing work after the closing date. These claims accrued, I find, as of the date of non-compliance with the asset purchase agreement. Therefore I conclude that most of these claims are not time-barred, to the extent damages for non-compliance are sought. By contrast, however, I conclude that laches bars CertainTeed from seeking specific performance of these obligations after acting so slowly in bringing suit. A demand

A-64

Not Reported in A.2d                                                                                          Page 2
Not Reported in A.2d, 2005 WL 217032 (Del.Ch.)
**(Cite as: 2005 WL 217032 (Del.Ch.))**

for specific performance is akin to a request for a mandatory injunction and it is not appropriate to measure promptness by analogy to a statute of limitations for a damages claim. CertainTeed's inexcusable torpidity in bringing suit prejudices Celotex.

The final category involves a classic claim for third-party indemnification based on liabilities that CertainTeed allegedly incurred as a result of Celotex having (as operator of the business CertainTeed bought) sold defective roofing materials. As this is a claim for third-party indemnification, it did not accrue until CertainTeed settled the product claims in July 2001. CertainTeed brought suit within three years of that date, and the claim is therefore timely.

### I. Overview

**\*2** CertainTeed is a manufacturer of building materials. Celotex, now bankrupt, was formerly a manufacturer of building materials, most (in)famously asbestos. Defendant Celotex Asbestos Settlement Trust (the "Trust") is the sole stockholder of Celotex, and for purposes of the asset sale at issue in this case, is Celotex's indemnitor. For brevity's sake and because the Trust has adopted Celotex's arguments in their entirety, I will not refer to the Trust in this opinion, except with regard to one unique argument that the Trust makes on its own behalf.

The facts underlying this dispute, upon which this motion shall be considered, are as set forth in CertainTeed's amended complaint (the "Complaint"). CertainTeed contracted with Celotex to purchase certain assets related to Celotex's roofing and fiberglass mat businesses, including the operating assets of those businesses, and certain facilities used for manufacturing those items. On June 29, 2000, the Asset Purchase Agreement (the "Agreement") effecting this transaction was executed. Significantly, the Agreement provided a remedy to compensate CertainTeed for environmental and other liabilities incurred in connection with the facilities. The sale closed on August 18, 2000 (the "Closing Date" or "Closing"), at which time CertainTeed took title to the four facilities now at issue (the "Facilities").

In this case, CertainTeed alleges three categories of losses for which it seeks relief from Celotex. I outline those

categories briefly now.

First, in the Agreement, Celotex made numerous representations and warranties concerning environmental conditions at the Facilities, the validity of various permits required for operations at the Facilities, and compliance with applicable environmental regulations. After Closing, however, CertainTeed began to discover various environmental problems that had been warranted not to exist. CertainTeed incurred losses related to these environmental problems, and sought reimbursement for these losses and certain other liabilities in accordance with the provisions of the Agreement. Celotex refused to acknowledge its liability for the claims asserted. CertainTeed has now sued, under various theories, to recover its losses in connection with the non-compliant conditions of the Facilities. I define these claims generally as the "Facilities Claims."

Second, CertainTeed has sued Celotex because Celotex allegedly failed to complete certain environmental remediation and testing activities required by the Agreement. I define these as the "Remediation Claims."

Third and finally, CertainTeed alleges that it suffered losses because Celotex had, before Closing, sold defective roofing products. CertainTeed settled claims made by a general contractor whose clients threatened to sue over damage caused by those products. It seeks indemnification for the settlement costs from Celotex. I call this claim the "Product Claim."

Celotex has brought this motion arguing that each category of claim was brought too late and that the Complaint should be dismissed on the basis of laches.

**\*3** The facts of this case are complex and numerous. In the interests of efficiency and readability, I will introduce most of the relevant facts in connection with the categories of claims I have outlined. Because all of CertainTeed's claims have their origins in the obligations undertaken and promises made by Celotex in the Agreement, it is necessary initially to discuss the relevant provisions of the Agreement and their implications for the pending motion.

Not Reported in A.2d                                                                                Page 3
Not Reported in A.2d, 2005 WL 217032 (Del.Ch.)
**(Cite as: 2005 WL 217032 (Del.Ch.))**

II. *Indemnification Provision Of The Asset Purchase Agreement*

Article 8 of the Agreement requires that Celotex reimburse CertainTeed for specified liabilities. Under the Agreement, Celotex retained liability for certain "Excluded Liabilities," including liabilities for certain environmental violations at the Facilities and third-party product liabilities. Celotex agreed to "indemnify" CertainTeed for: 1) losses related to breach of representations and warranties contained in the Agreement; 2) failure to perform covenants contained in the Agreement; and 3) the Excluded Liabilities.

As an initial matter, the potentially misleading use of the term "indemnification" in the Agreement requires clarification. CertainTeed has clung to this contractual term as a life raft against the sinking of its late-filed claims by contending that all of its claims must be considered as akin to common law claims for indemnification. Under Delaware law, claims for common law indemnity do not accrue until the indemnitee can "be confident that any claim against him ... has been resolved with certainty." [FN1] In other words, a cause of action accrues after the party seeking indemnification has made payment to the third party and the dispute with that party is finally concluded. [FN2] Because CertainTeed did not experience an ascertainable loss on any of its claims more than three years before it filed the Complaint, it alleges that all of its claims are timely. For reasons I will now explain, that argument lacks logical, legal, or equitable force.

FN1. *Scharf v. Edgcomb Corporation,* ____ A.2d ____, 2004 WL 2830885, at *8 (Del. Dec. 7, 2004).

FN2. *See Breakaway Solutions, Inc. v. Morgan Stanley & Co., Inc.,* 2004 WL 1949300, at *15 (Del. Ch. Aug. 27, 2004) ("[I]ndemnification claims do not accrue 'until the party seeking indemnification has made payment to the injured person." ') (citing *McDermott v. New York,* 406 N.E.2d 460, 461 (N.Y.1980)); *Chesapeake Utilities Corp. v. Chesapeake and Potomac Tel. Co. of Maryland,* 410 A.2d 101, 102 (Del.Super.Mar. 30, 1979) ("[T]he [indemnity] claim accrues and the statute begins to run only when the cause of action for indemnity arises, or the indemnitee's liability is

fixed and discharged. The determining factor is the point at which the indemnitee suffers loss or damage through payment of a claim after judgment or settlement.")

Article 8 of the Agreement [FN3] provides a contractual remedy for Losses sustained by CertainTeed, referred to as "Indemnification." [FN4] The term "Indemnification" is used here as a contractual term of art to describe this contractual remedy. In the context of a merger or asset acquisition, the term "indemnification" refers generally to the responsibility retained by the seller to make the buyer whole for liabilities related to the assets sold or for breaches of representations and warranties. [FN5] "Indemnification," as used in Article 8, does not refer to the common law right known as "indemnity." [FN6] That is, Article 8 does not provide a general right of reimbursement for debts owed to third parties by Celotex as a secondarily-liable party. This is evidenced by language in § 8.4(c) of the Agreement that specifically distinguishes "Third Party Claims" from claims generally covered under the indemnification remedy. [FN7] Instead, Article 8 generally sets forth the subject matter for which CertainTeed may bring claims and procedures for bringing such claims.

FN3. By its terms, the Agreement entitles its Articles, for example, "Article 8," but identifies subsections of its Articles as, for example, "Section 8.1." In keeping with this scheme, I will refer to the contractual indemnification remedy generally as "Article 8," but I will discuss specific provisions of the Agreement by reference to the corresponding section number.

FN4. Agreement at 39.

FN5. *See* Lou R. Kling and Eileen T. Nugent, *Negotiated Acquisitions of Companies, Subsidiaries, and Divisions,* § 1.05[5], at 1-39 (2001) ( "[Indemnification] provisions grant either party (particularly, the purchaser) the right to recover, post-closing, for misrepresentations and non-compliance with covenants by the other party ").

**A-66**

Not Reported in A.2d                                                                    Page 4
Not Reported in A.2d, 2005 WL 217032 (Del.Ch.)
(Cite as: 2005 WL 217032 (Del.Ch.))

FN6. *See* 42 C.J.S. *Indemnity* § 2 at 73 (1991) ("[Common law] indemnity is a device by which a tort-feasor 'passes through' his entire liability to a third party whom the tort-feasor alleges is the real party responsible for injury.").

FN7. Agreement at 39 (defining Third Party Claims as "any Action against the Indemnitee by a third party which ... if prosecuted successfully, would be a matter for which the Indemnitee is entitled to indemnification under this Agreement ...").

\*4 Section 8.1 of the Agreement establishes the broad scope of coverage of the indemnification remedy, stating in relevant part that:

[Celotex agrees to] indemnify, defend and hold harmless [CertainTeed] from, against and in respect of any Losses arising from or related to:

(a) any breach or inaccuracy ... in any representation or warranty of [Celotex] hereunder ...;

(b) the failure of [Celotex] to perform any covenant or agreement to be performed by it hereunder;

(c) any or all of the Excluded Liabilities .... [FN8]

FN8. Agreement at 39-40.

"Losses," as referenced in § 8.1, are defined in § 1.1 of the Agreement:

"Loss" means any and all claims, losses, liabilities, damages, costs and expenses (including attorney's, accountant's, consultant's and expert's fees and expenses) that are imposed upon or otherwise incurred or suffered by the relevant party. [FN9]

FN9. Agreement at 6.

"Excluded Liabilities," as referenced in § 8.1, are also defined in § 1.1 of the Agreement, which states in relevant part:

"Excluded Liabilities" means all liabilities of [Celotex] other than the Assumed Liabilities, including (without limitation): (a) any other liabilities of [Celotex] ...; (b) the Other Environmental Liabilities; (c) the Acquired Assets Environmental Liabilities; (d) the costs to complete the

Remediation Projects properly ... [FN10]

FN10. Agreement at 4-5.

Section 8.3(a) of the Agreement sets temporal limitations on indemnification claims and lawsuits brought under Article 8 as follows:

[N]o claims may be made or suit instituted under any provision of this Article 8 after the second (2nd) anniversary of the Closing Date, except for:

(i) claims of the Buyer for Losses related to Acquired Assets Environmental Liabilities, which shall survive the execution and delivery of this Agreement and the Closing until the third (3rd) anniversary of the Closing Date; *provided however,* that it is of the essence that, after the third (3rd) anniversary of the Closing Date, the Buyer shall have no claim, including (without limitation) any claim for indemnification or contribution, against the Seller for or with respect to Acquired Assets Environmental Liabilities other than such claims which are Reserved Claims as of that date; and

(ii) Reserved Claims which shall survive indefinitely (subject to any applicable statute of limitations). The term "Reserved Claims" means all claims: (1) as to which the Indemnitee has given the Indemnitor proper notice pursuant to § 8.4 below prior to the expiration of the applicable survival period; (2) based upon actual fraud or intentional misrepresentation on the part of the Indemnitor at or prior to the Closing; or (3) based upon Excluded Liabilities (other than Acquired Assets Environmental Liabilities) or Assumed Liabilities, as the case may be. [FN11]

FN11. Agreement at 41.

Section 8.4(a) requires that CertainTeed must provide Celotex with appropriate written notice in order to assert a valid claim:

A claim for indemnification hereunder ... shall be made by [CertainTeed] by delivery of a written notice to [Celotex] requesting indemnification and specifying in reasonable detail the basis on which indemnification is sought and the amount of the Losses incurred (if known) ... [FN12]

A-67

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                      Page 5
Not Reported in A.2d, 2005 WL 217032 (Del.Ch.)
**(Cite as: 2005 WL 217032 (Del.Ch.))**

FN12. Agreement at 42.

**\*5** The plain language of Article 8 establishes "survival periods" during which claims may be brought or reserved. CertainTeed may bring claims after the survival periods only if they are reserved in accordance with § 8.3(a)(ii). "Reserved Claims" may be brought after the third anniversary of the Closing Date, subject to the "applicable statute of limitations," which, based on the combined effect of § 10.9 of the Agreement [FN13] and *10 Del. C.* § 8106, is three years for contract and tort claims. [FN14] The cumulative effect of these provisions is that CertainTeed's Article 8 claims are valid only if:

> FN13. Agreement at 49. Section 10.9 of the Agreement states that Delaware substantive law governs the parties' rights under the Agreement.
>
> FN14. *10 Del. C.* § 8106 provides a three-year statute of limitations governing actions for breach of contract (*see Fike v. Ruger,* 754 A.2d 254, 260 (Del. Ch.1999)) and actions for torts (*see Becker v. Hamada,* 455 A.2d 252, 256 (Del.1982)).

1. the asserted liability is within the scope of Article 8;

2. an indemnifiable Loss was sustained;

3. notice of the claim was filed within the applicable survival period;

4. the claim was converted to a Reserved Claim, permitting it to survive the third anniversary of the Closing Date; and

5. this action was filed within the "applicable statute of limitations" for each claim.

The cumulative impact of these provisions quickly dispels CertainTeed's key argument concerning claim accrual. CertainTeed advances a theory that statutes of limitation as to all of its claims begin to run only after the entirety of each claimed loss has been established, [FN15] citing case law supportive of the proposition that claims for indemnification accrue when an indemnifiable loss is sustained. [FN16] Although this general proposition is a correct statement of the law governing third-party indemnification, [FN17] CertainTeed's argument misconstrues the indemnification remedy provided under

Article 8 of the Agreement as implicating common law theories of indemnity. At issue here is a contractual remedy, termed "Indemnification," that has no direct relation to common law indemnification. CertainTeed argues that, under its theory, indemnification claims could be brought when the first dollar of loss is sustained, but the statute of limitations would not begin to run until the last dollar of loss is sustained. [FN18] The Agreement clearly rejects that argument. Section 8.3(a)(ii) states that claims for indemnification survive subject to the "applicable statute of limitations," making clear that the timeliness of any claim will be measured by the statute of limitations normally applicable to such a claim. Further, the clear implication of the Agreement is that time is of the essence in submitting claims under Article 8, [FN19] and thus, absent claim-specific justifications for its application, this "last dollar" theory is invalid. Nevertheless, CertainTeed's theory is not wholly without merit, because the "applicable statute of limitations" for third-party claims could be subject to accrual principles of common law indemnity

> FN15. Pl. Br. at 15 (citing *United States Fidelity & Guarantee Co. v. Gray's Adm'rs,* 97 A. 425 (Del.Super.1916); *Salovaara v. SSP Advisors, L.P.,* 2003 WL 23190391 (Del. Ch. Dec 22, 2003); *Shinault v. Nationwide Mut. Ins. Co.,* 1995 WL 270089 (Del.Super. Mar. 13, 1995); *Council of Unit Owners of Sea Colony, Phase III Condominium v. Carl M. Freeman Associates, Inc.,* 1989 WL 40973 (Del.Super.Apr. 11, 1989)).
>
> FN16. *United States Fidelity & Guarantee Co. v. Gray's Adm'rs,* 97 A. 425 (Del.Super.1916); *Chesapeake Utilities Corp. v. Chesapeake and Potomac Tel. Co. of Maryland,* 401 A.2d 101 (Del.Super.1979); *Seitz v. A-Del Const. Co.,* 1987 WL 16711 (Del.Super.Aug. 13, 1987); *Council of Unit Owners of Sea Colony, Phase III Condominium v. Carl M. Freeman Associates, Inc.,* 1989 WL 40973 (Del.Super.Apr. 11, 1989); *City Investing Co. Liquidating Trust v. Continental Cas. Co.,* 1992 WL 65411 (Del. Ch. Mar. 30, 1992); *Getty Oil Co. v. Catalytic, Inc.,* 509 A.2d 1123 (Del.Super.1986); *Shively v. Ken-Crest Centers for*

A-68

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                                    Page 6
Not Reported in A.2d, 2005 WL 217032 (Del.Ch.)
**(Cite as: 2005 WL 217032 (Del.Ch.))**

*Exceptional Persons,* 1998 WL 960719 (Del.Super.Nov. 19, 1998).

FN17. *See* cases cited *supra* notes 2, 15-16.

FN18. Transcript at 72-73.

FN19. Agreement, § 8.3(a)(i) (stating in relevant part that "... it is of the essence that, after the third (3rd) anniversary of the Closing Date, [CertainTeed] shall have no claim ...").

Therefore, in the case of counts for breach of contract and misrepresentation, where claims involve direct injury to CertainTeed--e.g., claims resting on the assertion that CertainTeed was injured because a Facility's environmental condition was not as represented in the Agreement--timeliness is to be measured by the statute of limitations for breach of contract and torts, respectively, with accrual occurring at the date of breach or injury, absent tolling. Only if the underlying claim for contractual indemnification is actually a claim for losses resulting from liability to a third party (i.e., like a common law indemnity claim) will CertainTeed's claim accrue at the time when the last dollar of loss is ascertainable. [FN20]

FN20. *See* cases cited *supra* note 2.

*6 It should also be noted that, at this stage, I assume that all of CertainTeed's claims complied with the first four requirements of Article 8. [FN21] That is, all of CertainTeed's claims: 1) are subject to indemnification under Article 8; 2) seek indemnification for Losses sustained by CertainTeed; 3) were properly submitted to Celotex within the applicable survival period; and 4) were converted to Reserved Claims. Therefore, the validity of each of CertainTeed's claims stands or falls on its compliance with the "applicable statute of limitations."

FN21. There may be one exception to this general statement. The Complaint does not allege that CertainTeed's claim for losses incurred at the Russellville, Alabama Facility was submitted to Celotex in accordance with the requirements of § 8.4 of the Agreement. But Celotex does not argue this point, and I assume that such notice was given.

III. *Legal Standard For A Motion to Dismiss*

The timeliness of claims may be determined on a motion to dismiss if the facts pled in the complaint, and the documents incorporated within the complaint, [FN22] demonstrate that the claims are untimely . [FN23] In considering such a motion, the court applies the plaintiff-friendly principles of Rule 12(b)(6), namely that well-pled allegations in the complaint be accepted as true, and that reasonable inferences be drawn in favor of the plaintiff. [FN24] At the same time, however, when a plaintiff seeks to excuse a late filing by invoking a tolling exception to the statute of limitations, the plaintiff bears the burden to plead facts demonstrating the applicability of the exception. [FN25] When that burden is not met, the court must dismiss the complaint if filed after expiration of the limitations period. [FN26]

FN22. CertainTeed has submitted a substantial volume of exhibits as an appendix to its Amended Complaint. Court of Chancery Rule 10(c) states that "[a] copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes." Exhibits submitted by CertainTeed are thus appropriately considered here.

FN23. *See, e.g. In re Dean Witter Partnership Litigation,* 1998 WL 442456, at *3 (Del. Ch. July 17, 1998); *Kahn v. Seaboard Corp.,* 625 A.2d 269, 277 (Del.Ch.1993).

FN24. *See Dean Witter,* 1998 WL 442456, at *4.

FN25. *See id.* at *6 ("[T]he party asserting that tolling applies ... bear[s] the burden of pleading specific facts to demonstrate that the statute of limitations was, in fact, tolled.").

FN26. *See id.* at *4.

While statutes of limitation do not formally apply in equity, this court typically applies statutes of limitation by analogy in addressing a laches argument. [FN27] In this case, the parties have not argued for any general departure from the typical approach, and I adhere to it for the most part. Importantly, however, I note that CertainTeed seeks specific

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 217032 (Del.Ch.)
**(Cite as: 2005 WL 217032 (Del.Ch.))**

performance of certain affirmative obligations Celotex allegedly failed to perform in accordance with its duties under the Agreement. A claim for specific performance is a specialized request for a mandatory injunction, requiring a party to perform its contractual duties. [FN28] Like any request for an injunction, such a claim necessarily invokes a stricter requirement for prompt action by the plaintiff, and a plaintiff may not wait the full period of three years set forth in § 8106 to seek such relief. [FN29] Laches, rather, will arise much earlier, if a plaintiff sits on its claim and does not demand prompt action.

> FN27. *See generally U.S. Cellular Inv. Co. of Allentown v. Bell Atlantic Mobile Systems, Inc., 677 A.2d 497, 502 (Del.1996)* ("Absent some unusual circumstances, a court of equity will deny a plaintiff relief when suit is brought after the analogous statutory period."); *Kahn, 625 A.2d at 272* ("where the statute bars the legal remedy, it shall bar the equitable remedy in analogous cases or in reference to the same subject matter.").

> FN28. *See* Donald J. Wolfe and Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery,* § 12-3, 12-34 (2004).

> FN29. A request for specific performance may be defeated by a laches defense. *See* Wolfe & Pittenger at § 12-3, 12-49. Specific performance is regarded as a serious remedy, however, that is only available when monetary damages are inadequate. *See id.* at 12-35. The seriousness of the specific performance remedy justifies elevation of aspects of the burden of persuasion of the plaintiff in proving a contractual violation. To obtain specific performance, a plaintiff must prove "the existence and terms of an enforceable contract by clear and convincing evidence." *Id.* As a result, it seems plain that mandatory relief of this kind invokes the same requirement of alacrity that applies to any other request for an injunction. *See Carey v. Landy, 1989 WL 44051, at *3 (Del. Ch. Apr. 27, 1989)* ("Injunctive relief will be denied where a plaintiff inexcusably delays for several years before taking

action."); *Hollingsworth v. Szczesiak, 84 A.2d 816, 822 (Del. Ch.1951)* (holding that, where a plaintiff is guilty of inexcusable delay, a grant of mandatory injunction may be inequitable).

*IV. Statute Of Limitations Analysis*

CertainTeed brings claims for various breaches of contract and for tortious misrepresentations. Celotex argues that all of these claims are time-barred. There is no dispute that the "applicable statute of limitations" for each of CertainTeed's claims is three years, however, this limitations period is subject to tolling in certain circumstances that are arguably present here. The statute of limitations analysis differs for each of the subsets of claims that CertainTeed asserts.

In addressing the timeliness of the various claims made by CertainTeed, I am required to apply settled principles of law recently reiterated by the Delaware Supreme Court in *Wal-Mart Stores Inc. v. AIG Life Ins. Co.* [FN30] Those principles require the court to consider three major issues before deciding that a claim is time-barred when a plaintiff contends that a tolling exception to the statute of limitations applies.

> FN30. 860 A.2d 312 (Del.2004).

**\*7** First, the court must ascertain the date of accrual of the cause of action. *Wal-Mart* holds that a cause of action accrues "at the time of the wrongful act, even if the plaintiff is ignorant of the cause of action." [FN31] The "wrongful act" is a general concept that varies depending on the nature of the claim at issue. For breach of contract claims, the wrongful act is the breach, and the cause of action accrues at the time of breach. [FN32] For tort claims, the wrongful act is a tortious act causing injury, and the cause of action accrues at the time of injury. [FN33] Where the claim is one for indemnification or contribution for damages paid to a third party, a cause of action accrues only after the party seeking indemnification has made payment to the third party. [FN34]

> FN31. *Id.* at 319.

> FN32. *See Ambase Corp. v. City Investing Co., 2001 WL 167698, at * 14 n. 4 (Del. Ch. Feb. 7,*

Not Reported in A.2d                                                    Page 8
Not Reported in A.2d, 2005 WL 217032 (Del.Ch.)
**(Cite as: 2005 WL 217032 (Del.Ch.))**

2001).

FN33. See *Kaufman v. C.L. McCabe & Sons,* 603 A.2d 831, 834 (Del.1992)

FN34. See cases cited *supra* notes 2, 15-16.

Second, the court must determine whether the statute of limitations has been tolled. Generally, the statute of limitations runs from the date of accrual, except when the plaintiff shows that a tolling exception applies. Such exceptions include the doctrines of fraudulent concealment, [FN35] inherently unknowable injury, [FN36] and equitable tolling. [FN37] When a tolling exception applies, the statute of limitations will not run until the plaintiff is on inquiry notice of her claims.

FN35. See *Halpern v. Barran,* 313 A.2d 139, 143 (Del. Ch.1973).

FN36. See *Isaacson, Stolper & Co. v. Artisan's Savings Bank,* 330 A.2d 130, 132 (Del.1974).

FN37. See *Dean Witter,* 1998 WL 442456, at *6.

Assuming a tolling exception applies, the third step that is required under *Wal-Mart* is to consider when the plaintiff received inquiry notice, because when that occurs, the statute of limitations begins running. Inquiry notice does not require actual discovery of the reason for injury. [FN38] Rather, it exists when the plaintiff becomes aware of "facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery [of injury]." [FN39]

FN38. *Id.* at *7 (emphasis omitted).

FN39. *Wal-Mart,* 860 A.2d at 319 (citations and emphasis omitted).

This court, and our Supreme Court, have emphasized that a plaintiff is expected to act with alacrity once she has reason to suspect that her rights have been violated, and that the statute of limitations runs from the point at which the plaintiff, by exercising reasonable diligence, should have discovered her injury. [FN40]

FN40. *Dean Witter,* 1998 WL 442456, at *6; *U.S. Cellular,* 677 A.2d at 504 n. 7.

With these principles in mind, I turn to addressing the categories of claims brought by CertainTeed. That task is unduly complicated by the Complaint, which unnecessarily proliferates redundant counts based on identical conduct, dividing single claims involving breaches of the Agreement into multiple counts. For the sake of analytical clarity, I have organized the claims into more readily understandable categories.

V. *Application Of The Statute Of Limitations Analysis To Each Category Of Claims*

A. *Facilities Claims*

The first category of claims is the largest in number and in economic importance, or so it appears. This category involves claims that the environmental conditions existing at four of the Facilities were inconsistent with the conditions represented and warranted in the Agreement. Although CertainTeed has pled these claims confusingly, in essence it alleges that Celotex breached representations and warranties in the Agreement--a breach of contract claim--and seeks contractual indemnification under the Agreement. CertainTeed has repetitively pled contractual claims based on the same non-compliance under different rubrics, including contractual indemnification, breach of contract, specific performance, and declaratory judgment. [FN41] Nonetheless, each is ultimately a claim for breach of contract. Under *10 Del. C. § 8106,* a three-year statute of limitations applies.

FN41. Complaint, Counts I, II, V, VI, and VII.

**\*8** Despite what appears to be the plain language of § 8.3(c) of the Agreement, which precludes CertainTeed from suing for fraud as to false representations and warranties, [FN42] CertainTeed has also pled that Celotex committed fraudulent misrepresentation by providing false representations and warranties of the conditions of the Facilities. Even assuming these claims are viable, under *10 Del. C. § 8106,* CertainTeed's misrepresentations are also subject to a three-year statute of limitations, and whether treated as breach of contract or as tort, the accrual date as to

A-71

all of these claims was the date of Closing. On that date, CertainTeed's contractual rights were breached and it was injured by receiving Facilities the value and nature of which were not as represented. Because the Complaint was filed more than three years after Closing, the key question as to this category becomes whether a tolling exception applies and, if so, when CertainTeed was on inquiry notice of its claims. A category-wide discussion of these issues is useful as precedent to considering each Facility individually.

> FN42. Agreement, § 8.3(c) (stating in relevant part: *"Sole Remedy* . The indemnification remedy provided in this Article 8 shall be [CertainTeed's] sole and exclusive remedy for breaches of the representations and warranties of [Celotex] ...").

CertainTeed explicitly argues only one tolling exception--fraudulent concealment. But a claim of fraudulent concealment must be supported by a showing that a defendant knowingly took affirmative steps to prevent a plaintiff from learning facts or otherwise made misrepresentations intended to "put the plaintiff off the trail of inquiry." [FN43] In its Complaint, exhibits, and other pleadings, CertainTeed alleges no post-Closing acts by Celotex attempting to cover up non-compliant conditions at the Facilities. Further, after Closing, the Facilities were under CertainTeed's own dominion. And, as will be seen, CertainTeed discovered the non-compliant conditions at various of the facilities almost immediately upon assuming ownership, rendering the fraudulent concealment exception even less applicable to this case.

> FN43. *Halpern,* 313 A.2d at 143.

Implicitly, [FN44] but a bit more logically, CertainTeed argues that the non-compliant conditions at the Facilities were inherently undiscoverable and, for that reason, the statute of limitations was tolled. Frankly, that argument, at first blush, appears wholly strained. Any purchaser of industrial manufacturing facilities in our society knows of the serious risk that there will be conditions on the property, resulting from past operations, that violate relevant environmental laws and that will have to be cleaned up by the present owner. That is why purchasers of such properties procure environmental audits before buying. [FN45] To

apply the inherently unknowable injury doctrine, which originally addressed situations where surgeons left items within the bodies of their patients, in a dissimilar circumstance so as to excuse a tardy filing by a sophisticated, multi-billion dollar corporation like CertainTeed has no apparent commercial or equitable logic. [FN46] Rather, one would think that the law should expect such purchasers to do appropriate due diligence before purchase.

> FN44. CertainTeed did not squarely invoke the inherently unknowable injury exception in its brief, but explicitly raised it and directly relied upon it at oral argument.

> FN45. By way of example, when CertainTeed sold the Los Angeles Facility to the University of Southern California less than one year after the Closing Date, USC insisted upon such environmental audits as a condition precedent to closing, and further, in connection with that sale, extracted from CertainTeed an obligation to remediate all environmental damage discovered on that property.

> FN46. Admittedly, the doctrine of inherently unknowable injury has been applied in cases when a defendant's wrongdoing was unknowable because evidence of a defendant's negligence was, for example, buried underground. In *Rudginski v. Pullela* (378 A.2d 646 (Del.Super.1977)), purchasers of a new septic system were held to have had no reason to suspect the new system they had purchased was defective until it malfunctioned. Here, however, CertainTeed was not purchasing a new underground product that it would have been entitled to assume was in proper working order. It was purchasing industrial facilities of more than modest vintage, on which it was already aware of some environmental problems and on which it should have suspected that other problems might also exist.

**\*9** There are arguably two reasons why the doctrine might credibly apply in a situation like this one. Assume the

Not Reported in A.2d                                                                                          Page 10
Not Reported in A.2d, 2005 WL 217032 (Del.Ch.)
**(Cite as: 2005 WL 217032 (Del.Ch.))**

purchaser of an industrial facility extracted from the seller the pre-closing obligation to have independent environmental audits performed and to receive clean results of those audits. In such cases, the buyer could reasonably be considered to have acted diligently by, in essence, extracting from the seller conduct of responsible due diligence that should have detected non-compliant conditions. [FN47] Having done so, the buyer would be entitled to assume that facilities were as contractually warranted until inquiry notice to the contrary arose. Why? Because one would assume that the non-compliant conditions, if discoverable, would have been detected by the pre-Closing audits.

> FN47. *See, e.g., Pack & Process, Inc. v. Celotex Corp., 503 A.2d 646, 650-1 (Del.Super.1985)* (holding that where, in accordance with a contractual relationship, a buyer relied on a seller's expertise and assurances in determining the existence and cause of damages to the subject property, and where the buyer could only discover the failure of the seller to perform in good faith and in accordance with the seller's contractual obligations through hiring an independent specialist to make the same inspections required of the seller, the buyer could be "blamelessly ignorant" for the purposes of tolling analysis).

By contrast, CertainTeed acted here with much less diligence, extracting as to each Facility representations and warranties that environmental conditions were acceptable, and the right to receive any environmental audits that had been conducted by Celotex in the past five years. That is, CertainTeed did not act prudently in ascertaining the true conditions of the Facilities before Closing. In my view, CertainTeed's argument that procuring the representations and warranties themselves as to the compliant conditions of the Facilities was sufficient to invoke the inherently unknowable injury doctrine is a non-sequitur. It is the breach of these very representations and warranties that creates a claim; the question is whether the breach is reasonably discoverable. Otherwise, any claim for breach of a contractual representation would toll the statute of limitations on the grounds that the representation itself somehow rendered the breach of the representation

undetectable. CertainTeed's own Complaint, as we shall see, refutes the notion that a party using rational commercial practices could not have discovered the non-compliant conditions.

As a result, CertainTeed is, in my view, in a weak position to invoke the inherently unknowable injury doctrine. But a recent decision of our Supreme Court makes it arguable that CertainTeed can invoke the doctrine, even on this record and even given its lack of reasonable prudence. In *Wal-Mart,* the Supreme Court held that one of America's largest corporations, despite having a huge legal department and access to the best outside legal advice money could buy, could not be expected to discover that its utilization of a tax-avoidance strategy advocated by insurance brokers might be ruled by the Internal Revenue Service to be improper. [FN48] This ruling sets a low threshold for the use of the doctrine of inherently unknowable injury, but one that is hard for a trial court to ignore.

> FN48. 860 A.2d 312.

Given that the conditions CertainTeed claims could not be detected were at least as hidden as the legal risk Wal-Mart supposedly could not identify, I accept solely for the sake of argument that the misrepresented environmental conditions at the Facilities were not discoverable and that the statute of limitations was tolled with respect to the Facilities Claims until CertainTeed was on inquiry notice.

**\*10** At the same time, however, the commercial context does, to my mind, matter. CertainTeed premises its claims on one Asset Purchase Agreement. Once it had reason to suspect, despite the pre-Closing representations and historical environmental audits to be provided to it by Celotex, that some of the Facilities did not comply with their warranted condition, CertainTeed was not entitled to lean back in the recliner and not investigate whether, as to other of the Facilities, similar breaches also existed. Rather, knowing that it could not rely on Celotex's pre-Closing representations and audits, CertainTeed was duty-bound to investigate and to try to discover all of its claims against Celotex. [FN49] With this in mind, I next turn to determining when CertainTeed was on inquiry notice, which must be analyzed on a facility-by-facility basis.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                  Page 11
Not Reported in A.2d, 2005 WL 217032 (Del.Ch.)
**(Cite as: 2005 WL 217032 (Del.Ch.))**

FN49. *See U.S. Cellular,* 677 A.2d at 509, n. 7 ("[W]hatever is notice calling for inquiry is notice of everything to which such inquiry might have led.").

### 1. *The Birmingham Facility*

The Complaint alleges that the Birmingham, Alabama Facility was non-compliant because soil and groundwater were contaminated with naphthalene, coal tar, and other hazardous substances. But the Complaint also admits that the non-compliance was suspected before Closing [FN50] and confirmed in October 2000. [FN51] Thus, at the very latest, inquiry notice triggered the running of the statute of limitations in October 2000, but CertainTeed waited more than three years after that date to file suit. Even after receiving formal notice of a permit violation, CertainTeed took almost two more years to sue.

FN50. Complaint ¶ 78.

FN51. Complaint Ex. K at 4 (noting that Water Quality Data recorded between August and October 2000 "demonstrated naphthalene concentrations far in excess of targeted federal and state water quality criteria").

The existence of coal tar waste in the soil was ascertained at the Birmingham Facility soon after Closing. Naphthalene contamination was found in groundwater between August and October 2000, [FN52] and in the soil in February 2001. [FN53] On July 30, 2002, CertainTeed received notification that the Birmingham Facility was not in compliance with its National Pollution Discharge Elimination System Permit. [FN54] Making all inferences in favor of CertainTeed, the statute of limitations was tolled until October 2000 at the latest, when groundwater contamination was first ascertained. Although other injuries were discovered after October 2000, the initial discovery constituted "the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery" of other contamination and noncompliance with permit requirements. [FN55] Thus, the applicable statute of limitations began to run soon after the Closing Date and expired soon after the third anniversary of the Closing Date, in October 2003. As to the Birmingham

Facility, the Facilities Claims filed May 28, 2004 are therefore time-barred.

FN52. *Id.*

FN53. *Id.*

FN54. Complaint Ex. L at 5.

FN55. *Wal-Mart,* 860 A.2d at 319.

### 2. *The Cincinnati Facility*

At the Cincinnati, Ohio Facility, shortly after Closing, CertainTeed discovered liquid hydrocarbons floating on groundwater. [FN56] On an unspecified date thereafter, CertainTeed also discovered petroleum and tar contamination in the soil. [FN57] Here again, discovery of groundwater contamination constituted inquiry notice for other environmental liabilities. The statute of limitations was tolled only until "shortly after the Closing Date." [FN58] The Facilities claims relating to the Cincinnati Facility were not filed within the limitations period that began to run shortly after Closing, and are thus time-barred.

FN56. Complaint ¶ 101.

FN57. Complaint ¶ 103.

FN58. Discovery of contamination at the Cincinnati facility is characterized as having occurred "shortly after closing," and the actual date is not specified. In order for this action filed May 28, 2004 to have been timely, however, discovery would have to have been sometime after May 28, 2001, more than nine months after the Closing Date. While I am obliged to make plaintiff-friendly inferences, I am not obliged to make unreasonable inferences.

### 3. *The Los Angeles Facility*

**\*11** Based on conditions that had already been discovered at the Birmingham and Cincinnati Facilities, by October 2000, CertainTeed should have suspected that environmental conditions at the other acquired Facilities were also potentially non-compliant and begun to undertake diligent discovery efforts. Having been given reason to suspect two

Westlaw.

Not Reported in A.2d                                                                                                      Page 12
Not Reported in A.2d, 2005 WL 217032 (Del.Ch.)
**(Cite as: 2005 WL 217032 (Del.Ch.))**

very serious breaches, CertainTeed could not fail to act with diligence as to other possible instances of non-compliance by taking prudent steps to ascertain the environmental condition of each Facility.

In this regard, the plain averments of the Complaint implicitly but unmistakably concede that CertainTeed was on inquiry notice as to possible non-compliance at the Los Angeles Facility more than three years before it filed its May 28, 2004 Complaint. In the Complaint, CertainTeed alleges that non-compliance at Los Angeles was first confirmed on May 31, 2001 in an Environmental Site Assessment report disclosing the existence of contamination. [FN59] But, the Assessment obviously does not reflect results discovered the very day that the report was completed or the date when results were first delivered to CertainTeed. Rather, it manifests the results of CertainTeed's actions in response to earlier inquiry notice. As of May 31, 2001, CertainTeed indisputably should have been on actual notice of the non-compliance, but the statute of limitations had already begun running no later than the time when CertainTeed first initiated the Assessment, which was obviously many months before then.

> FN59. Complaint Ex. G at 1-2. CertainTeed alleges that it did not actually receive the Environmental Site Assessment dated May 31, 2001 until mid-July 2001. CertainTeed evidently failed to inquire as to the results of an environmental assessment in progress that indisputably would have constituted inquiry notice as early as May 31. Instead, CertainTeed passively waited to be informed of contamination more than one month after it was discovered. CertainTeed's failure to monitor results of an environmental assessment as they became available supports a general conclusion that its failure to discover injuries at the Los Angeles Facility was due more to a lack of diligence than to inherent undiscoverability.

After receiving actual notice in mid-July of injuries that could have been ascertained on May 31, 2001, CertainTeed also learned of the existence of underground storage tanks that had leaked other contaminants. Instead of acting promptly in the face of this information, CertainTeed waited

until May 28, 2004 to sue on its Facilities Claims. This was clearly more than three years after inquiry notice existed. For this reason, the Los Angeles Facilities Claims are untimely and shall be dismissed.

The Los Angeles Facilities Claims are also untimely for a related, although not identical reason. As noted earlier, CertainTeed's notice of non-compliant conditions at Birmingham and Cincinnati shortly after Closing triggered a more general duty of inquiry on CertainTeed's part. CertainTeed should have suspected non-compliance might exist at the Los Angeles Facility after deficient conditions were discovered at Birmingham and Cincinnati. [FN60] Notably, the Birmingham and Cincinnati Facilities, like the Los Angeles Facility, were used for the manufacture of roofing materials. All three of these Facilities used asphalt in their manufacturing processes and maintained asphalt storage tanks on the premises. [FN61] All three of these facilities maintained storage tanks for diesel fuel, waste oil, or other petroleum products on the premises. [FN62] Contamination ultimately discovered at all three of these Facilities involved hydrocarbons and tar. Given the similarities between the Facilities and the environmental conditions allegedly concealed at each of them, a person of ordinary intelligence and prudence would have been on inquiry notice of the injurious conditions at the Los Angeles Facility shortly after the Closing Date, when injurious conditions were discovered at the Birmingham and Cincinnati Facilities. On these facts, the statute of limitations for bringing claims related to the Los Angeles Facility began to run, at the latest, from the earlier of the date when groundwater contamination was discovered at the Birmingham facility in October 2000 or the date when CertainTeed commissioned the Assessment, a date clearly earlier than May 31, 2001, when results of Phase I of that assessment were reported. Under either date, the Los Angeles Claims were filed too late, and this action, filed May 28, 2004, is time-barred.

> FN60. *See* Complaint Ex. P at 2. The similarity of the injuries at the Facilities was not lost on CertainTeed. In a letter to Celotex disclosing conditions at the Cincinnati facility, CertainTeed noted that "material discovered at the Cincinnati

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 13
Not Reported in A.2d, 2005 WL 217032 (Del.Ch.)
**(Cite as: 2005 WL 217032 (Del.Ch.))**

Facility is similar to the material discovered at the Birmingham Facility, which we have discovered is coal tar, a hazardous substance."

FN61. Agreement, Schedule 4.18.

FN62. Id.

### 4. The Russellville Facility

*12 CertainTeed brings claims for losses at the Russellville Alabama Facility related to the condition of a regenerative thermal oxidizer ("RTO") used at that Facility to reduce air emissions to a level in compliance with air pollution standards. In accordance with the Agreement, Celotex conducted tests to assure that the RTO achieved required levels of emissions abatement before Closing. [FN63] After the Closing Date, CertainTeed questioned the validity of testing conducted by Celotex, [FN64] but waited until November 2003, several years later, to conduct its own testing of the RTO. It was only then that CertainTeed supposedly discovered that the RTO did not achieve the necessary level of emissions abatement, in violation of the facility's Air Pollution Control Permit. [FN65]

FN63. Complaint ¶ 109.

FN64. Complaint ¶ 120.

FN65. Complaint ¶¶ 111-126.

The Russellville Claims are time-barred because CertainTeed was on inquiry notice more than three years before it filed this lawsuit. Given CertainTeed's own admission that it immediately suspected the reliability of the pre-Closing test results, and its own immediate discovery of non-compliant conditions at other facilities, CertainTeed should have tested the performance of the RTO itself soon after Closing. By waiting until more than three years elapsed after Closing to test for itself, CertainTeed unreasonably delayed and let the statute of limitations lapse. [FN66]

FN66. Celotex has advanced the theory that CertainTeed lacks standing to sue because title to the Russellville facility was transferred at Closing to Vetrotex, a subsidiary of CertainTeed. Because

CertainTeed's claims with respect to the Russellville facility can be dismissed on other grounds, the question of standing need not be addressed here.

### B. Remediation Claims

CertainTeed's Remediation Claims comprise the second category of claims against Celotex. In the Agreement, Celotex covenanted to perform, after Closing, certain environmental remediation, monitoring, and testing obligations related to known or suspected environmental conditions at the Cincinnati [FN67] and Birmingham [FN68] Facilities. Celotex's obligations are set out in § 6.13 and Disclosure Schedule 6.13 of the Agreement.

FN67. Complaint ¶¶ 145, 147, 166, and 217(a).

FN68. Complaint ¶¶ 141, 165 and 217(a).

CertainTeed alleges that Celotex failed to perform these post-Closing remediation obligations at the Cincinnati and Birmingham Facilities, and requests an order for specific performance here, or alternatively, damages. CertainTeed's claims for failure of Celotex to meet its remediation obligations are breach of contract claims that accrued on the date of the breach. Section 6.13(a) of the Agreement requires that Celotex complete all remediation projects no later than one year from the Closing Date, on August 18, 2001, and CertainTeed argues that any cause of action for breach of Celotex's failure to meet its remediation obligations accrued at the time performance was due on that date. Celotex argues that breach occurred much earlier, alleging that CertainTeed either refused performance or Celotex notified CertainTeed that it would not comply with its obligations at each of these Facilities shortly after Closing.

Celotex suggests that frustration of performance by CertainTeed or its own anticipatory repudiation of its performance obligations set the three-year statute of limitations running soon after the Closing Date, and that CertainTeed's claims as to both Facilities are now time-barred. Those arguments rely on facts outside the Complaint, and cannot serve as a basis for granting a motion to dismiss here. If the facts are reasonably construed in

Not Reported in A.2d                                                                                               Page 14
Not Reported in A.2d, 2005 WL 217032 (Del.Ch.)
**(Cite as: 2005 WL 217032 (Del.Ch.))**

favor of CertainTeed, the statute of limitations for its Remediation Claims would have expired on August 18, 2004, three years after Celotex's performance of its obligations was due, and this action for breach of contract was timely filed on May 28, 2004. Accordingly, CertainTeed's claim for damages as a result of the failure of Celotex to perform its remediation obligations cannot be dismissed.

**\*13** The remediation claims, however, raise distinct considerations in an important respect. Although Celotex's remediation claims may have accrued on August 18, 2001, the doctrine of laches does not permit CertainTeed to obtain an order of specific performance at this late stage. As discussed earlier, a request for specific performance is a specialized demand for a mandatory injunction. As a result, it is not the case that the statute of limitations applies by analogy. Rather, a party seeking specific performance must act with alacrity or lose its rights. [FN69] Here, CertainTeed's tardiness was unreasonable, and is unfairly prejudicial. Celotex covenanted under the Agreement to address environmental conditions at the Facilities that existed at Closing. Implicit in this covenant is that Celotex was required to rectify problems that it created. With the passage of time, Celotex's responsibility for current environmental conditions at those Facilities grows more and more tenuous, and requiring performance by Celotex four years after it relinquished control over the Facilities would be unreasonable and prejudicial to Celotex. Further, specific performance is an equitable remedy normally applicable only in exigent circumstances, for example, in situations where an assessment of money damages would be impracticable or would somehow fail to do justice. [FN70] Here, there are no exigencies suggestive of a need for specific performance. A monetary assessment covering the cost of remediation services is an adequate remedy here.

> FN69. *See supra* notes 28-9 and accompanying text.

> FN70. *E.g., Equitable Trust Co. v. Gallagher,* 102 A.2d 538, 546 (Del.1954).

Although I will not deny CertainTeed the chance to recover the reasonable costs of performing, on its own, the remediation activities specifically identified in the Agreement, the intervening period of time must equitably be taken into consideration in that calculus as well. That will require CertainTeed to demonstrate not only what it spent to perform the remediation activities, but also to prove that no intervening events occurred since CertainTeed assumed ownership of the Facilities that made the work more expensive to complete.

CertainTeed also claims that Celotex failed to perform certain testing obligations at the Russellville Facility in an acceptable manner. [FN71] Section 6.13(b) of the Agreement requires that air emission "stack testing" be performed at the Russellville Facility by an independent third-party contractor in accordance with requirements set forth in Schedule 6.13(a) of the Agreement. [FN72] Notably, § 6.13(b) requires that this testing be performed no later than July 14, 2000. [FN73] Any claim for breach of contract accrued, at the latest, at the time performance was due, which was July 14, 2000. The three-year statute of limitations for bringing a claim for that breach thus expired on July 14, 2003, and this action, filed May 28, 2004, is time-barred as to the Russellville Remediation Claims.

> FN71. Complaint ¶¶ 167-168.

> FN72. Agreement at 34.

> FN73. *Id.*

### C. *Product Liability Claims*

CertainTeed's claims for product liability comprise the third category of claims considered here. Celotex, in the Agreement, retained liability for claims related to products sold before the Closing Date. [FN74] Celotex manufactured and sold a line of algae-resistant shingles, the granular coating of which, in conjunction with certain unfavorable environmental conditions, is alleged to have caused the corrosion of gutters and other aluminum fixtures on the houses of certain consumers in two California neighborhoods who had purchased and installed the shingles on their roofs. [FN75] CertainTeed received complaints from consumers whose homes had been damaged by the shingles, demanding the replacement of corroded aluminum fixtures, primarily gutters, with copper fixtures. [FN76]

Westlaw.

Not Reported in A.2d                                                                                                    Page 15
Not Reported in A.2d, 2005 WL 217032 (Del.Ch.)
**(Cite as: 2005 WL 217032 (Del.Ch.))**

When this occurred, CertainTeed promptly notified Celotex. Celotex acknowledged that the product claims were Excluded Liabilities under Section 2.2 of the Agreement and stated that it would exercise its right to provide a defense against the third-party claims. [FN77] On July 18, 2000, a homeowners' association in one of the neighborhoods stated its intent to sue the builder who built their homes for damages related to the algae-resistant shingles. The builder, in turn, communicated to CertainTeed that, due to the unacceptable delay in resolving the claims of the affected consumers, he was not inclined to use CertainTeed products in the future. [FN78] On July 19, 2001, CertainTeed, evidently pressured to resolve these claims quickly, [FN79] indicated that if Celotex did not act, CertainTeed would undertake the replacement of the corroded aluminum gutters on July 25, 2001. [FN80]

> FN74. The assumption of product liabilities by Celotex is somewhat circuitous. Section 8.1 of the Agreement defines the scope of the Indemnification clause under which Celotex is bound to compensate CertainTeed for losses. Indemnifiable losses include, under § 8.1(c), Excluded Liabilities. Section 2.2 defines Excluded Liabilities as including "all liabilities of the Seller, other than the Assumed Liabilities." Section 2.2 defines Assumed Liabilities as including "all Assumed Product Claims." Section 2.2 further defines Assumed Product Claims as including "all liabilities related to the resolution of product claims," but excluding "product claims to the extent arising from or related to damage to property, bodily injury, or death." Thus, under § 8.1, Celotex retains liability for product claims related to damage to property, such as those at issue here.

> FN75. Complaint ¶¶ 174-178 and Ex. R.

> FN76. Complaint ¶¶ 175-178 and Ex. R at 2. The chemical reaction that damaged the aluminum gutters was specific to aluminum metal, and did not corrode copper. Replacement of aluminum gutters with copper gutters was supposedly the most practical means of solving the problem.

> FN77. Complaint, ¶ 180 and Ex. S.

> FN78. Complaint Ex. S at 2.

> FN79. Complaint Ex. T at 2. CertainTeed alleges that, although Celotex stated its intent to assume a defense of the third-party claims, it failed to do so in a timely manner. Presumably, this failure of Celotex to consider the matter quickly prompted the builder to issue an ultimatum that required immediate action by CertainTeed.

> FN80. Complaint Ex. S.

**\*14** The principles of accrual and tolling applicable to CertainTeed's Product Liability Claims differ from those applicable to its Facilities Claims. These Product Liability Claims are not direct claims against Celotex, but claims for damages paid to third parties. Claims for third-party liabilities accrue in accordance with principles of common law indemnity. Under this standard, CertainTeed's Product Liability Claims accrued, and the statute of limitations began to run, when the indemnifiable losses to the third parties were incurred and the dispute with them concluded, [FN81] which was when CertainTeed settled its third-party claims.

> FN81. *See* cases cited *supra* notes 2, 15-16.

Making inferences favorable to CertainTeed, its Product Liability Claims accrued when the consumer claims were settled, sometime after July 25, 2001. The statute of limitations began to run when the claims were settled and expired on the third anniversary of that date in 2004. This action, filed May 28, 2004, is therefore timely as to CertainTeed's Product Liability Claims. [FN82]

> FN82. Celotex argues that CertainTeed failed to comply with other requirements of the Agreement in asserting its Product Liability Claims. That may well be the case. There is language in the Agreement permitting Celotex to provide a defense against third-party claims, and Celotex alleges that, although it had indicated to CertainTeed that it wished to provide a defense for claims related to the algae-resistant shingles, CertainTeed

A-78

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 217032 (Del.Ch.)
**(Cite as: 2005 WL 217032 (Del.Ch.))**

Page 16

nevertheless settled the claims unilaterally, in contravention of the terms of the Agreement. This is an argument on the merits, however, that depends on facts and documents outside the Complaint, and is not appropriately resolved on this motion to dismiss.

### VI. *Remaining Issues*

The timeliness of the Facilities, Remediation, and Product Liability Claims is the central issue on this motion. In their sprawling papers, the parties also tangled over a few other issues, which I next address.

### A. *The Viability Of CertainTeed's Claims That Celotex Breached Its Contractual Obligation To Mediate*

CertainTeed has pled, as supposedly independent claims, counts alleging that Celotex breached the Agreement by refusing to participate in the mediation process contemplated by § 8.4 of the Agreement in order to resolve the various Article 8 claims the timeliness of which this opinion has just addressed. CertainTeed seeks specific performance or, in the alternative, damages for these supposed breaches. As with the other claims for specific performance, I conclude that CertainTeed's torpor renders it guilty of laches and bars its request for an order of specific performance. If CertainTeed wished to compel mediation--a process that by its nature has no guaranteed outcome--it should have filed suit much earlier.

As important, I conclude that the only possible relief CertainTeed could receive for any failure of Celotex to mediate is an order of specific performance. By its very nature, an obligation to mediate is simply an obligation to attempt, with the aid of a third party neutral, to resolve a dispute in good faith. It is an "agreement to try to agree." Under the Agreement as written, the pendency of mediation did not excuse the party seeking relief from making a timely filing in order to satisfy the statute of limitations. [FN83] CertainTeed cannot revive its time-barred substantive claims through the guise of arguing that Celotex's failure to mediate them somehow tolled the statute of limitations as to those claims.

FN83. Agreement at 42. Section 8.4(b) states that

"[C]elotex may file an Action during the Negotiation Period or the Mediation Period if the indemnification would otherwise be subject to dismissal for a failure to file within applicable statutes of limitation."

Nor is there any basis for this court to render a damages award based on its approximation of the level at which the parties might have hypothetically settled after mediation. Even in circumstances when commercial parties draft a term sheet that is intended to serve as a template for a formal contract, the law of this state, in general, prevents the enforcement of the term sheet as a contract if it is subject to future negotiations because it is, by definition, a mere agreement to agree. [FN84] That reasoning applies with even greater force when, as here, a party seeks after long delay to recover damages because its contractual party failed to honor an "agreement to try to agree" on terms for the settlement of a dispute. Therefore, these counts of the Complaint are dismissed.

FN84. *See, e g , International Equity Capital Growth Fund, L.P. v. Clegg,* 1997 WL 208955, at *9 n. 3 (Del. Ch. Apr. 22, 1997) ("Delaware law ... require[s] the parties to have reached agreement on all material terms before an 'agreement to agree' will be enforced.")

### B. *Celotex's Motion To Dismiss Aspects Of CertainTeed's Request For Damages*

**\*15** Celotex has argued that the ad damnum clause of the Complaint contains requests for damages that are excluded under the Agreement. Section 8.3(b)(iii) of the Agreement states that the "Buyer may not assert a claim for indemnification for Losses for ... special or consequential damages except to the extent such damages are part of a Loss arising from a Third Party Claim." Celotex claims that this exclusion bars CertainTeed's requests for awards of lost profits, attorney's and consultant's fees, and costs to bring this suit. CertainTeed retorts citing the general definition of "Loss" in § 1 1 of the Agreement, which includes "any and all ... costs and expenses (including attorney's, accountant's, consultant's and expert's fees and expenses) that are imposed upon or otherwise incurred ... by the relevant party." [FN85]

Not Reported in A.2d                                                                              Page 17
Not Reported in A.2d, 2005 WL 217032 (Del.Ch.)
**(Cite as: 2005 WL 217032 (Del.Ch.))**

Further, CertainTeed looks to § 3 of the Trust Indemnification Agreement, under which the Trust assumed liability as a third party indemnitor for claims asserted by CertainTeed against Celotex, stating that "The Trust hereby agrees to pay any and all expenses (including attorneys' fees and expenses) reasonably incurred by [CertainTeed] in enforcing any rights under this Indemnification Agreement." [FN86]

FN85. Agreement at 6.

FN86. Trust Indemnification Agreement at 4.

Frankly, the parties' briefing on this issue is inadequate to reach any definitive resolution on this difference of opinion. It appears certain that CertainTeed cannot receive an award of lost profits for its surviving Remediation Claims, and its claim for that category of damages is therefore dismissed. It is not apparent, however, that the other recompense it seeks falls outside the contractual definition of Loss and within the category of consequential damages, particularly given the specific language of § 1.1 of the Agreement and the lack of sufficient briefing on this question. Therefore, I will not preclude CertainTeed from pressing forward with its claims for the other relief it has requested. If it becomes necessary later in the case, when the question of damages is before the court in a more concrete context, Celotex can again present the argument that certain remaining categories of relief sought constitute excludable consequential damages.

## C. The Trust's Motion To Dismiss On The Ground That The Claims Against It Are
### Not Ripe

The Trust has moved to dismiss all of CertainTeed's claims on ripeness grounds, arguing that, consistent with accrual principles of common law indemnity, [FN87] as Celotex's indemnitor, its third-party liability to CertainTeed accrues only after a judgment has been rendered against Celotex. Thus, the Trust contends, it is not a proper defendant in the present action.

FN87. *See* cases cited *supra* notes 2, 15-16.

The Trust's obligations to indemnify CertainTeed are limited, and contingent upon a judgment against Celotex. As to the claims pled in the Complaint, CertainTeed has no right to assert claims for losses against the Trust until Celotex's assets, under a specific letter of credit, are exhausted. [FN88] That has not occurred yet. Give that reality, and given that the Trust conceded that it will be bound by and have no right to relitigate any judgment against Celotex, [FN89] CertainTeed has sued the Trust prematurely and the claims against the Trust are dismissed without prejudice. When CertainTeed's contractual right to seek indemnity against the Trust ripens, it will be free to reassert these claims, which will depend for their force on CertainTeed's ability to obtain a judgment against Celotex.

FN88. Trust Indemnification Agreement at 3. Section 2(c) states that "CertainTeed will not be entitled to assert claims for Losses directly against the Trust until the Letter of Credit is exhausted ..."

FN89. Transcript at 128-9.

### VII. *Conclusion*

**\*16** For all the foregoing reasons, Celotex's motion to dismiss the Facilities Claims is GRANTED; its motion to dismiss the Remediation Claims is GRANTED as to CertainTeed's demand for specific performance and is otherwise DENIED; its motion to dismiss the Product Liability Claims is DENIED; its motion to dismiss CertainTeed's claim that Celotex failed to mediate in accordance with the Agreement is GRANTED; and its motion to dismiss CertainTeed's request for lost profits as to the Facilities Claims (which are barred on other grounds) and Remediation Claims is GRANTED. The Trusts's motion for dismissal on ripeness and contractual grounds is GRANTED.

Within ten days, Celotex and the Trust shall, upon notice as to form by CertainTeed, submit an implementing order dismissing the relevant counts of the Complaint addressed by this opinion. CertainTeed has pled counts for declaratory judgment that track the Facilities and Remediation Claims categories. The parties shall also include in the implementing order language that dismisses those counts to the extent that the related counts for damages have not survived and permitting those counts to remain to the extent that the related counts for damages have weathered this

Westlaw.

Not Reported in A.2d                                                     Page 18
Not Reported in A.2d, 2005 WL 217032 (Del.Ch.)
**(Cite as: 2005 WL 217032 (Del.Ch.))**

motion.

Not Reported in A.2d, 2005 WL 217032 (Del.Ch.)

END OF DOCUMENT

EXHIBIT "I"

Westlaw.

Not Reported in A.2d                                                                                      Page 1
Not Reported in A.2d, 1997 WL 127994 (Del.Super.)
**(Cite as: 1997 WL 127994 (Del.Super.))**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

Superior Court of Delaware, New Castle County.
Richard GREENSTEIN, Plaintiff,
v.
Robert Burton COONIN, Esquire, Defendant.
**Civil Action No. 96C-01-101-JOH.**

Submitted: Jan. 16, 1997.
Decided: Feb. 5, 1997.

Upon Motion of Plaintiff for Reargument - DENIED.

Kevin William Gibson, Kassab, Archbold & O'Brien,
L.L.P., for plaintiff.

F. Alton Tybout, Tybout, Redfearn & Pell, for defendant.

*MEMORANDUM OPINION*
HERLIHY, Judge.

**\*1** This is a legal malpractice action arising out of a claim
that defendant Robert Coonin failed to timely file a medical
malpractice claim. In a bench ruling on December 16, 1996,
this Court ruled that the medical malpractice statute had run
prior to Coonin's involvement in the case. Therefore, there
could be no legal malpractice claim and the Court granted
Coonin's motion for summary judgment. Defendant Richard
Greenstein moves to reargue that decision.

*FACTS*
Greenstein saw Dr. Louis Centrella, a family practitioner,
on May 14, 1990 complaining of pains in his lower left side.
Dr. Centrella found nothing wrong. Either Greenstein did
not see Dr. Centrella after that or there was no further
consultation or treatment for this complaint.

On March 9, 1992, Greenstein was admitted to the
Christiana Medical Center emergency room. His complaint
was acute abdominal pain. A colonoscopy and scraping
were preformed on March 25, 1992. The biopsy showed the
presence of colon cancer. A massive, mature tumor was
removed on April 16, 1992.

Greenstein first consulted Coonin on August 31, 1992 about
a possible medical malpractice claim against Dr. Centrella.
Dr. Philip Rothbart was retained as an expert by Greenstein.
Dr. Rothbart expressed the opinion that Dr. Centrella's
malpractice was the failure to do more testing in 1990 which
would have uncovered the colon cancer.

Through counsel other than Coonin, Greenstein filed a
malpractice action against Dr. Centrella in May 1994. That
action was dismissed in 1995 on statute of limitations
grounds. That dismissal prompted Greenstein to sue Coonin
for failure to timely file the malpractice action.

In the motion for reargument, Greenstein has submitted
material which was not submitted in connection with
Coonin's summary judgment motion. He indicates the
physician overseeing his chemotherapy told him in June
1992 that his tumor was eight years old. There was no
explanation why this information was not proffered
previously.

*APPLICABLE STANDARD*
A motion for summary judgment requires the Court to
determine whether there are any genuine issues of material
fact and whether the moving party is entitled to judgment as
a matter of law. [FN1] There are no factual issues
precluding summary judgment. [FN2] For purposes of the
original summary judgment motion and the motion to
reargue, the Court will assume that had a malpractice action
been timely filed, there would have been a verdict for
Greenstein, that is, there was a valid medical malpractice
claim.

> FN1. *Delmar News, Inc. v. Jacobs Oil Co.,*
> Del.Super., 584 A.2d 531 (1990).

> FN2. *Pierre v. International Ins. Co. of Ill.,*
> Del.Supr., 671 A.2d 1361, 1363 (1996).

*DISCUSSION*
Delaware has a two-year statute of limitations for medical
malpractice actions. [FN3] "Solely in the event of personal
injury the occurrence of which, during such period of 2
years, was unknown to and could not in the exercise of
reasonable diligence have been discovered by the injured

Not Reported in A.2d
Not Reported in A.2d, 1997 WL 127994 (Del.Super.)
**(Cite as: 1997 WL 127994 (Del.Super.))**

person, such action may be brought prior to the expiration of 3 years from the date upon which such injury occurred, and not thereafter." [FN4]

> FN3. 18 *Del. C.* §6856.
>
> FN4. *Id*

**\*2** Whether two or three years, the statute of limitations starts on the last date of the negligent treatment. [FN5] Under Delaware law, such date is the date of the last alleged *negligent* treatment prior to the point in time the plaintiff knew of the negligent treatment. [FN6]

> FN5. *Ewing v. Beck,* Del.Supr., 520 A.2d 653, 662 (1987).
>
> FN6. *Ogden v. Gallagher,* Del.Supr., 591 A.2d 215, 219 (1991).

There is no dispute that the complaint or condition for which Greenstein saw Dr. Centrella in May 1990 is the same as that for which he was treated in March and April 1992. Greenstein, however, argues that Dr. Centrella's failure to diagnose his cancer in May 1990 continued until it was diagnosed in March 1992. Dr. Philip Rothbart has opined for Greenstein that such failure to diagnose was continuing. Further, it is contended, Greenstein relied upon the misdiagnosis in not seeking treatment making the May 1990 failure continuing.

This is not Delaware law. "A patient's reliance is not the health care provider's act." [FN7] The test act must be "an *affirmative* happening or event." [Emphasis in original]. [FN8] Thus, Delaware has clearly rejected the continuing treatment doctrine and the result it creates that a patient's reliance is important. [FN9]

> FN7. *Benge v. Davis,* Del.Supr., 553 A.2d 1180, 1185 (1989).
>
> FN8. *Id*
>
> FN9. *Id* at 1184-85.

There are two parts to the issue of the applicable statute of limitations. One is the date of the last act of negligent medical treatment and the second is the date upon which Greenstein had actual or constructive knowledge of the negligent cause of treatment. [FN10]

> FN10. *Bissell v. Papastavros Associates Medical Imaging,* Del.Super., 626 A.2d 856, 861, (1993).

Under Delaware law, May 14, 1990 is the date of the last negligent act of treatment. The inquiry then becomes the date on which Greenstein had actual or constructive knowledge of Dr. Centrella's (alleged) negligent course of treatment. In this case, is that March 9, 1992, March 24, 1992 or April 16, 1992? Or is it June 8, 1992?

Greenstein's motion for reargument contains information never made known previously in this case. It was not included in his original response to Coonin's motion for summary judgment. This is a non-arbitration case filed in January 1996. There was no bar to discovery precluding supplying this statement in a more timely fashion.

Obviously, when Greenstein says he first learned in June 1992 of the tumor's age, eight years, he is arguing that this is the first date he knew or could have known of Dr. Centrella's negligent treatment. Since June 8, 1992 is after May 14, 1992, the two-year anniversary of the alleged malpractice, this new supplied information is an attempt to get a third year. This would mean the statute would have expired May 14, 1993 - after Greenstein consulted with Coonin.

The Court is deeply troubled by the appearance for the first time in a motion to reargue of information known to Greenstein since June 1992 and which has just surfaced. It is a practice not appreciated. The belated attempt, however, does not change the result. If anything, it reenforces it.

The Supreme Court has adopted the reasonably prudent person test as part of the analysis of whether a malpractice plaintiff has actual or constructive knowledge of the negligent treatment. [FN11] In addition, the Supreme Court established a presumption "that a patient who actually consults with an independent health care provider about the same condition which is subsequently the subject matter of

Not Reported in A.2d                                                                    Page 3
Not Reported in A.2d, 1997 WL 127994 (Del.Super.)
**(Cite as: 1997 WL 127994 (Del.Super.))**

an alleged negligent medical continuum knew or in the exercise of reasonable diligence could have known about the prior negligent course of conduct on date of the consultation with the independent health care provider." [FN12]

> FN11. *Ewing,* 520 A.2d at 664.

> FN12. *Id*

*3 Further, if the patient gets independent medical advice from such a provider in the form of a second opinion or consultation, the patient has a duty to inquire not about his or her condition but to ask about the prior course of treatment. [FN13]

> FN13. *Bissell,* 626 A.2d at 861.

Greenstein appeared in the hospital emergency room on March 9, 1992 with acute abdominal pain. As of March 25, 1992, he knew he had a cancerous tumor in his colon. A large, mature cancerous tumor was removed on April 16, 1992. As of April 16, 1992, if not March 25, 1992, all parts of the *Ewing* test were met.

There is no evidence that Greenstein inquired of his treating doctors anything about Dr. Centrella's treatment. Unquestionably, the news about a large cancerous tumor was devastating but that did not relieve Greenstein of his duty to inquire. Under the circumstances, even with the harshness of the news that he had cancer, it is unclear why he did not inquire about his prior treatment.

The alleged conversation Greenstein had on June 8, 1992 about his tumor reenforces the knowledge available to him in March and April and the duty to inquire. Further, his statement attached to the motion for reargument does not say even *then* he inquired about his prior treatment.

Greenstein knew or had reason to know within two years of May 14, 1990 that there was a potential claim for medical malpractice. That means the additional year is not available to him.

His claim, to the extent there was one, against Dr. Centrella expired on May 14, 1992. Greenstein did not consult with

Coonin until August 31, 1992. The statute of limitations had already run. Under these circumstances, there can be no cause of action against Coonin for legal malpractice.

### CONCLUSION
For the reasons stated herein, the motion for reargument of plaintiff Richard Greenstein is DENIED.

IT IS SO ORDERED.

Not Reported in A.2d, 1997 WL 127994 (Del.Super.)

END OF DOCUMENT

EXHIBIT "J"

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| FACTORY MUTUAL INSURANCE<br>COMPANY, a/k/a FM GLOBAL<br>a/s/o Catalog Resources, Inc. d/b/a ClientLogic<br>A subsidiary of ClientLogic Operation Corporation<br><br>and<br><br>THE HARTFORD a/s/o Vivre, Inc.<br><br>      Plaintiffs,<br><br>      v.<br><br>EAST COAST ERECTORS, INC.,<br>LIGHTHOUSE CONSTRUCTION, INC.,<br>BECKER MORGAN GROUP, INC.,<br>and O'DONNELL, NACCARATO &<br>MACINTOSH, INC.<br><br>      Defendants. | : : : : : : : : : : : : : : : : : : : : | Civil Action No. 05-96 JJF<br><br>JURY OF TWELVE DEMANDED |

### PLAINTIFF, FACTORY MUTUAL INSURANCE COMPANY, a/k/a FM GLOBAL a/s/o CATALOG RESOURCES, INC. d/b/a CLIENTLOGIC, A SUBSIDIARY OF CLIENTLOGIC OPERATIONS CORPORATIONS' ANSWERS TO DEFENDANT, EAST COAST ERECTORS, INC.'S INTERROGATORIES

COMES NOW Factory Mutual Insurance Company a/k/a FM Global a/s/o Catalog Resources, Inc. d/b/a ClientLogic, a Subsidiary of ClientLogic Operations Corporation, Plaintiff in the above-styled action, and submits by and through its attorneys Rogut McCarthy Troy LLC, answers to the following Interrogatories pursuant to Federal Rules of Civil Procedure 33.

### ANSWERS TO INTERROGATORIES

1.    Identify all persons known or believed to possess knowledge or information concerning the subject matter of this lawsuit, and with respect to each person you identify, please provide a reasonable description of the knowledge or information you believe him/her to possess.

1995 Building and any other systems or objects installed or connected to the structure of the 1999 Building to the 1995 Building.

**ANSWER:** Plaintiff, Factory Mutual is unaware of any such drawing or documents other than those produced in the course of discovery in this matter.

15.    Have you received any payments or other benefits from any insurers in connection with the collapse of the 1995 Building? If so, please state the following:

(a)    Identify all documents, including, but not limited to, payment or disbursement schedules, any assignments, loan receipts, proof of loss forms, statements, affidavits, or agreements evidencing the date, amount, and manner of each payment and benefit.

**ANSWER:** No. To the extent Plaintiff, Factory Mutual has made payments to its insured; those payments have been documented, identified and explained in the documents provided pursuant to Factory Mutual's Rule 26 Disclosure Statements and Factory Mutual's expert reports.

16.    Please itemize with specificity each cost, expense, and other item of damage that you allege you are entitled to recover in this lawsuit. In your response:

(a)    Identify the payee and amount of each cost, expense, and other items of damage;

(b)    Identify all documents that reflect or support each cost, expense, and other items of damage, including the document number or "Bates" number.

**ANSWER:** The costs, expenses and other items of damage sustained as a result of the collapse and for which Factory Mutual makes claim in this lawsuit are itemized and documented

in Factory Mutual's Rule 26 Disclosure and Factory Mutual's expert reports previously supplied to defendants.

17.    Do you have custody or do you know of any persons who have custody of any materials, parts, or components of the 1995 Building or the 1999 Building? If so, please state the following:

(a)    Identify each material, part, and component that has been retained;

(b)    Identify the person or party with custody of each material, part, and component;

(c)    State whether (and identify where applicable) any test, study, evaluation, or analysis has been performed or is planned to be performed for each material, part, and component; and

(d)    Identify all photographs, data, reports, calculations, memoranda, notes, log entries, correspondence, recordings, documents or other tangible evidence that exist from each test, study, evaluation, and analysis you identified in subsection (c) above.

**ANSWER:**    No. Plaintiff, Factory Mutual does not have custody and has never had custody of any such materials, parts or components or either building.

18.    Identify every representative of ECE with whom you have had direct contact or communication. Your response should include the following information:

(a)    The name of your representative(s) who had contact or communication with ECE;

10

A-87

## VERIFICATION

I, Geoffrey Varrasse, hereby Swear and depose that I am employed by Factory Mutual Insurance Company, that as such I am familiar with the facts of this matter and am authorized to take this verification for plaintiff, Factory Mutual Insurance Company, and that the information set forth in the foregoing ANSWERS TO INTERROGATORIES is true and correct to the best of my knowledge, information and/or belief. This verification is made under oath and subject to the penalties for falsification to authorities.

Dated: __July 26, 2005__    _____

                                              Geoffrey Varrasse

A-88