Exhibit "A"

JUN. 18. 1998   11:13AM
PHONE NO. : 3027418575

98084.02

FROM : CATALOG*RESOURCES*INC

DOUG VAN SANT, FACILITIES MANAGER
97 COMMERCE WAY, DOVER, DE 19904
OFFICE TELEPHONE:       302-741-8502
C.R.I. FAX:       302-678-9200



**CATALOG RESOURCES, INC.**

# Fax

| | | | |
|---|---|---|---|
| To: | GREG MOORE / BM2OR | From: | DOUG VAN SANT |
| Fax: | 734-7965 | Pages: | [Click here and type # of pages] |
| Phone: | N/A | Date: | June 18, 1998 |
| Re: | EXPANSION SKETCHES | CC: | N/A |

☐ Urgent   ☐ For Review   ☐ Please Comment   ☐ Please Reply   ☐ Please Recycle

• **Comments:** Greg:

Here are copies of 2 sketches I prepared for consideration

of the proposal to add an extension to our main building's

office section...for what they're worth.

Also, I am concerned about parking. We're going to need

probably a couple hundred new spaces provided on this

site as we will be abandoning the 106 now fully utilized at

Bldg. 200, and the 140 at Bldg. 100 (we didn't use all those).

I will work up a maximum shift employee number for spaces

required, and forward that to you when ready.

Call me anytime for further info. Thanks.

*Doug V.S.*

EXHIBIT
Moore-14
DEBRA J. WEAVER
3-15-05

BMG01777

B1

FROM : CATALOG*RESOURCES*INC

JUN.18.1998  11:14AM  P 2
PHONE NO. : 3027418575



PROPOSED 2-STY.
ADDITION TO
BLDG. 1

1" = 100'

BMG01778

B2



PRELIMINARY   1"= 100'

BMG01779

B3

Exhibit "B"

```
 1                UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF DELAWARE
 3   - - - - - - - - - - - - - - - - - -x
     FEDERAL INSURANCE                   :    CIVIL ACTION
 4   COMPANY a/s/o                       :
     EZIBA.COM./AVACET,                  :    NO. 04-339
 5   INC., EZIBA                         :
     SECURITIES CORP.,                   :
 6           Plaintiff(s),               :            COPY
                 v.                      :
 7   LIGHTHOUSE                          :
     CONSTRUCTION, INC.,                 :
 8   BECKER MORGAN GROUP,                :
     INC., and O'DONNELL,                :
 9   NACCARATO &                         :
     MACINTOSH, INC.,                    :
10           Defendant(s).               :
     - - - - - - - - - - - - - - - - - -x
11   MILLERS CAPITAL                     :    CIVIL ACTION
     INSURANCE COMPANY                   :
12   a/s/o DEL-HOMES                     :    NO. 04-1322-JJF
     CATALOG GROUP, LLC,                 :
13           Plaintiff(s),               :
                 v.                      :
14   LIGHTHOUSE                          :
     CONSTRUCTION, INC.,                 :
15   BECKER MORGAN GROUP,                :
     INC., and O'DONNELL,                :
16   NACCARATO &                         :
     MACINTOSH, INC.,                    :
17           Defendant(s)                :
     and                                 :
18   LIGHTHOUSE                          :
     CONSTRUCTION, INC.,                 :
19           Defendant and              :
                 Third-Party            :
20               Plaintiff,              :
                 v.                      :
21   EAST COAST ERECTORS,                :
     INC.,                               :
22           Third-Party                 :
             Defendant.                  :
     - - - - - - - - - - - - - - - - - -x
23
24
```

B4

2

1                    Oral deposition of ROBERT C.

2  MacLEISH, held at the law offices of

3  CHRISSINGER & BAUMBERGER, 3 Mill Road,

4  Suite 301, Wilmington, DE 19806, on

5  Wednesday, March 16, 2005, beginning at

6  10:08 a.m., before Debra J. Weaver, a

7  Federally Approved RPR, CRR, CSR of NJ

8  (No. XI 01614) and Delaware (No. 138-RPR,

9  Expiration 1/31/08), and a Notary Public

10 of New Jersey, Pennsylvania and Delaware.

11

12

13

14

15

16

17

18

19

20

21

22              ESQUIRE DEPOSITION SERVICES

            1880 John F. Kennedy Boulevard

23                    15th Floor

         Philadelphia, Pennsylvania 19103

24                (215) 988-9191

B5

ROBERT C. MACLEISH

A.      Forbes.

Q.      And who was the contact --
who contacted whom?

A.      I'm assuming they contacted
Del-Homes, because Jack came to me.  A
phone call didn't come to me.  Jack
brought the conversation to me.

Q.      This is Jack Beiser?

A.      Beiser.

Q.      And by "they," are we
talking about Client Logic?

A.      Yes, sir.

Q.      And do you know, who was the
contact at Client Logic?

A.      At that time, no, I did not
know.

Q.      Who did you end up dealing
with?

A.      A combination of people.

Do you want me to tell you
when we met?

Q.      Sure.

A.      In June of '98, I went with
Jack and we met with Tim, I think Doug

ROBERT C. MACLEISH

Van Sant, and I think there was one or two other people.  I can't remember.  I think it was Tim and Doug.

And they laid out -- you know, they gave us a drawing that they had prepared of what they would like to do and was it feasible to be able to do that.

Q.    And was this the first concept meeting?

A.    If I remember correctly, yes.

Q.    And who is "they," when you say they gave you a drawing?

A.    Catalog Resources gave us a drawing.

Q.    Is that a drawing that you have in your files?

A.    I believe we do.

MR. GERBER:  Dave, is that a drawing that's been produced; do you know?

MS. PETRONE:  It might have been entered as an exhibit

B7

ROBERT C. MACLEISH

yesterday.

MR. BAUMBERGER: Yes. I think it was.

MR. GERBER: Moore-14.

BY MR. GERBER:

Q. Okay. I'm going to show you an exhibit that was marked yesterday as Moore Exhibit 14. It's a fax cover page with two drawings, or two pages of drawings that come right behind it. If you'd take a look at that.

A. Yes. That was given to us at that meeting.

Q. This is the drawing that was given to you at that meeting?

A. Yes.

Q. They showed you this drawing and asked you whether -- what did they ask you?

A. They wanted to know if it was possible that they could get a building of that configuration.

Q. The folks who gave you this drawing, these were the folks that ran

ROBERT C. MACLEISH

1  Catalog Resources Group?

2          A.     I don't know if they -- I

3  assume that they --

4          Q.     They ran the operation there

5  at Dover?

6          A.     I'm assuming that, yes.

7          Q.     Were they architects?

8          A.     Not that I'm aware of.

9          Q.     Were they structural

10 engineers?

11         A.     I don't know.

12         Q.     When you say they asked you

13 whether this could be done, what was

14 your -- who did they ask that of?

15         A.     I guess to Jack and I both.

16         Q.     And what did you tell them?

17         A.     Not knowing what the site

18 plan would hold, you know, what the

19 site -- what kind of restrictions were

20 there, we'd have to get back to them.

21 We'd have to get the information to an

22 engineer, see what we could do.

23         Q.     So what did you do?

24         A.     Forwarded that drawing to

B9

ROBERT C. MACLEISH

1   Becker Morgan Group to see if, you know,

2   could you get a building like that on

3   that site.

4          Q.     And had you worked with

5   Becker Morgan Group before?

6          A.     No.   That was the first time

7   that I engaged their services.

8          Q.     And how did you determine

9   that you were going to forward that

10  drawing to Becker Morgan Group?

11         A.     Charlie Rodriguez was Jack's

12  real estate agent and he had

13  recommended -- he had met them and he

14  was -- I don't know if they'd been there

15  that long, I wasn't that familiar with

16  them as a firm, and said that they did

17  real good work.   So I called them to get

18  a proposal.

19         The engineers that Jack had

20  used on his other jobs were kind of slow

21  in responding, you know, getting site

22  plans through and things.   So Jack and I

23  spoke about getting another proposal from

24  a different firm.

ROBERT C. MACLEISH

1          Q.     Did Jack Beiser tell you to
2  call Becker Morgan or did you determine
3  that on your own?
4          A.     Well, I got the
5  recommendation from Charlie, forwarded it
6  to Jack, and Jack agreed with Charlie's
7  recommendation.
8          Q.     Did you have a name at
9  Becker Morgan who was going to be your
10  contact person?
11          A.     Yes.   Charlie gave us Greg
12  Moore.
13          Q.     And did you call Greg Moore,
14  then?
15          A.     Yes.
16          Q.     And "then" being?   This was
17  what time frame now, roughly?
18          A.     It was probably fairly
19  quickly.   You know, probably -- it wasn't
20  long.   I mean, I can't even remember.
21          Q.     Summer '98?
22          A.     Oh, you mean as far as
23  contacting Greg?
24          Q.     Yes.

ROBERT C. MACLEISH

1          A.      Yes, it was definitely in

2    the summer of '98.   Spring of '98,

3    probably.

4          Q.      Had you met Greg before?

5          A.      Not -- that was the first

6    time I had met him.

7                  Later on we found out I went

8    to high school with his sister.   So we

9    probably had met prior to that.   And my

10   sister, I think, was in his class or

11   something like that.

12         Q.      What was Becker Morgan's

13   role in this project?

14         A.      Their initial role, they

15   started out as the civil engineers.   And

16   then they came in to be the architects

17   for the project.

18         Q.      Okay.   So their role

19   expanded from civil engineer?

20         A.      Yes, it did.

21         Q.      Did they become the

22   architect of record for the project?

23         A.      That was my recollection,

24   yes.

B12

ROBERT C. MACLEISH

1      Q.      All right.   You were in the
2  room yesterday --
3      A.      Yes.
4      Q.      -- during the testimony of
5  both Mr. Moore and Mr. Ernie Olds,
6  correct?
7      A.      Yes, sir.
8      Q.      The transcripts will speak
9  for themselves, but my recollection is
10 that they both said that Becker Morgan
11 had a more limited role of being -- their
12 drawings were for permit purposes.
13         Do you recall that?
14     A.      Yes, I do.
15     Q.      You have a different --
16     A.      I don't know that it's
17 different.  I guess it's how you define,
18 what is a permit.
19         When we engaged -- as we
20 started out, like you said, there was
21 a -- Client Logic/Catalog Resources, it
22 was kind of transitioning at that point,
23 provided drawings and sketches.  We're
24 not architects.  We're not engineers.  I

B13

ROBERT C. MACLEISH

1    can't do that kind of work.

2              They're asking space

3    planning questions, issues like that.

4    You can give them a footprint of what is

5    the maximum size building you can put on

6    this lot, from a land use perspective.

7    That's the first thing we needed to

8    determine was, could you even put a

9    building of that size on that lot.  Jack

10   was always looking at maximizing his

11   building space to return his capital on

12   his dollars for his land.  So that was

13   the first determination.

14             Once that was determined,

15   then that sketch, there was a meeting

16   held in September, when you figure out

17   there's a lot of issues with -- because

18   of the shopping center.  Jack,

19   fortunately, owned both properties,

20   that's what Greg was explaining, there

21   were conflicts with different things.  As

22   research was conducted and boundary lines

23   were established, the location of the

24   building kind of shifted with

ROBERT C. MACLEISH

1  different -- you know, in and out, we set

2  an offset of five feet.

3          Once we got a pretty good,

4  okay, this is what we think is the

5  footprint that we could put into here,

6  that's when Client Logic/Catalog

7  Resources came up with, here's a layout

8  of what we would like to see in there,

9  here's where we would like our shipping

10  and receiving, some things like that,

11  because it differed somewhat from what

12  that print is that you just showed me.

13          In September we had Becker

14  Morgan, Ernie, meet with the Client

15  Logic/Catalog Resources people to take

16  that print that they had given us and

17  develop a plan, you know, a sketch, a

18  schematic drawing, just to see, is this

19  kind of what you're looking for.  It

20  probably took him about a month, maybe a

21  little more than that, as I remember.

22          We turned that drawing over

23  to Catalog Resources/Client Logic and

24  then they reviewed it.  There was another

B15

ROBERT C. MACLEISH

meeting held in November where it was
finalized, you know, as far as, here's a
floor plan, a building plan that we're
looking at. And it was, basically, just
a grid pattern, setting up tentative
schematic plans.

At that time, we had
consulted and worked with Mike Williams
of East Coast Erectors about the type of
building to use. He had recommended -- I
remember when I was working with Walker,
on the original building, you know, we
can do structural steel and probably
deliver quicker and be very cost
competitive. So that was one of --
called Mike, again, from working with him
in the past.

I always found Mike to be
very knowledgeable and very helpful. Did
a lot of buildings like that. So we kind
of set up, and that's how we kind of came
up -- working with the architect,
everybody kind of worked to that point.
We were still going through the site plan

B16

ROBERT C. MACLEISH

1  approval process, but still moving

2  forward trying to define, working --

3  Catalog and Client, that's when they were

4  changing their name from Catalog to

5  Client Logic.  They were being bought out

6  by a bigger company.

7          I think Jerry King, who was

8  one of the principal owners, or

9  principals of Catalog Resources, was

10  involved initially.  When this took

11  place, he became removed.  And I can

12  never remember what that transition was

13  from that relationship.

14          So those drawings tended to

15  change.  And it was starting, stopping.

16  I think in November, Jack -- I was

17  involved in it, and the lease

18  negotiations at that point, got a

19  commitment from Tim Sylvester from Client

20  Logic that they were going to proceed

21  with the project, and started preparing

22  the lease agreements and stuff like that

23  to get them signed, which, then, that --

24  we started putting together schedules, as

B17

ROBERT C. MACLEISH

far as when did they want to occupy the

building, what kind of a construction

schedule; like I said, bringing to

conclusion the actual site plan approval

of that site.

In February, we took those

drawings and put out a bid package to

three steel contractors.  We used Becker

Morgan as the footprint, put a scope of

work together, and supplied that to three

different steel companies, and received

those bids back.  That was probably our

first package to work with.

Once we got those bids back,

then we made an award to East Coast

Erectors and had them commence on their

drawings to start that work.  They were

responsible for the design and

construction, the foundations of all the

structural steel package, foundations and

coordination.

And then from that point, it

just kind of kept moving forward.  There

was always an interaction between the

ROBERT C. MACLEISH

1  different, I'll call them major

2  subcontractors on each of the phases of

3  it, from East Coast to the roofer, which

4  was Quality, the foundation contractor,

5  he was a major sub, but he really

6  followed the drawings given to us by East

7  Coast.

8          But we had the roofer,

9  mechanical.  We had a plumbing

10  contractor, Ralph Degliobesi.  We had an

11  HVAC contractor, Polar, sprinkler

12  contractor, Grinnell.  Electrical was

13  H&A.  And the site work contractor, which

14  was a major, but those drawings were all

15  completed by Becker Morgan, was Cahall,

16  Ralph Cahall & Son.

17          Q.     Was there ever another

18  architect of record, other than Becker

19  Morgan?

20          A.     On the 1999 building?

21          Q.     Correct.

          A.     No.

          Q.     With respect to Catalog

Resources Group, which evolved into

Exhibit "C"

# PROPOSAL

**EAST COAST ERECTORS INC.**

February 23, 1999

Mr. Robert MacLeish
Del-Homes, Inc.
1575 McKee Rd., Suite 202
Dover, DE 19904

Re: Catalog Resources Building Expansion
Enterprise Business Park
Dover, DE

Dear Bob,

We are pleased to provide our price to design, supply and install the following material for a single story building 250,000 Sq. Ft. per your drawing A2.1 and specifications dated February 8, 1999.

**Structural Steel:** ___338___ Tons Including: Columns with masonry anchors, beams, girts, perimeter angle, or bent plate, teflon slide plates at (3) expansion joints, erection bolts and standard shop coat primer. Also included is all necessary framing for the required mezzanine and (2) cantilever type canopies at the shipping/receiving office.

Supplied only will be anchor bolts, leveling plates, and anchor bolts at the top of the 12'-0" masonry walls.

**Steel Joist:** ___247___ Tons Including: "K" Series Type joist complete with all top and bottom chord extensions, "X" type and Horizontal type bridging, shop coat (Gray) primer.

**Metal Decking:** ___2,500___ Squares of 1 ½" Type "B", 22 Gage painted gray roof deck. Also included is ___20___ Squares of 1 ½" 20 Gage Galvanized composite floor deck. Also included are all required pour stops, cell closures and side lap screws.

FABRICATING
ERECTING
WELDING
STRUCTURAL AND
MISCELLANEOUS
STEEL
P.O. BOX 448
NEW CASTLE,
DELAWARE 19720
302/323-1800


EXHIBIT
MacLeish - 25
DEBRA J. WEAVER
3-16-05

LH 01441

B20

Pg. 2 of 3

**Miscellaneous Metals:**

| | |
|---|---|
| 65- | Roof Frames 4' x 8' for Skylight/Smoke Vents |
| 2- | Roof Frames for Roof Hatches |
| 1- | Roof Access Ladder with cage @ Q-11 Bathroom |
| 1- | Roof Access Ladder without cage @ Mezzanine |
| 18- | Lintel Beams W/Plates for 10' Wide Over Head Doors |
| 2- | Lintel Beams W/Plates for 8' Wide Over Head Doors |
| 4- | Lintel Beams W/Plates for 6' Windows @ Mezzanine |
| 12- | Dock Leveler Frames |
| 1- | Metal pan stair at Mezzanine |
| 3- | 2 Line pipe handrails with wall rails @ "L" shaped loading dock stairs. |
| 2- | 2 Line pipe handrails @ straight loading dock stairs |

**Metal Siding:**

- All required 3' wide exposed fastener 26 gage siding by Nucor with standard color and finish.
- All required 3" fiberglass PSK backed insulation
- All required base, corner, window, louver and gable flashing
- All required wall "Z" type girts designed at L/240 and 80 MPH wind load.
- All required framing for 10 louver and 4 window openings

**Notes:**

- Masonry Block size is assumed 8"
- Live load is reduced per BOCA
- Design includes concrete foundations
- Lintels are supplied only

**PRICE:**        **$1,039,000.00**

LH 01442

B21

Pg. 3 of 3

**Options:**

1.   Dock Leveler Frame  Ea.                                    Add: ___400.00___

2.   Pure White Primer on underside of Deck              Add: _23,000.00_

3.   Supply and install all 4" metal studs required for    Add: _49,000.00_
     Parapet walls at the following locations
     1.  Line 6 Between E and Q
     2.  Line E Between 1 and 6
     3.  Line Q Between 6 and 11
     4.  Line 6  Between A and E
     5.  Line 1  Between A and E

4.   Allowance For reinforcing 200LF of existing Bar    Add: __$4,160.00__
     Joist and adding 4 Roof Drain Frames

     2 Men  3 Days    48 Hrs.  x $45  =  $2,160.00
     Material                                    1,000.00
     High Reach                               1,000.00
                                                   $4,160.00

**Exclusions:**

-Leader Heads                          -Field Touch Up
-Gutters                                    -Surveying
-Down Spouts                           -Shoring
-Light Gage Metal Studs              -Galvanizing
-Copings, Eave Trim or Gravel Stops  -White Primer on Joists
-Plywood Sheathing and Wood Blocking -Testing & Inspections
-Grouting                                 -Building Permits
-Joist reinforcing at concentrated Loads

Thank you for the opportunity to present this proposal.  If you have any questions do not
hesitate to call.

Sincerely,

Michael A. Williams

Michael A. Williams
MAW/pzp

If this proposal meets with your approval please sign and return one copy.

Accepted By:  Del-Homes, Inc.         _____
                                                          Name

                                              _____
                                                          Date

LH 01443

B22

# PROPOSED PROJECT SCHEDULE

Catalog Resources Expansion
Enterprise Business Park
Dover, DE

February 23, 1999

|  | Start | Complete |
|---|---|---|
| Design for Foundation and Structure | 3/1 | 3/12 |
| Fabrication of Steel | 3/12 | 4/30 |
| Erection of Steel | 5/3 | 6/15 |
| Erection of Siding | 5/24 | 7/7 |
| Miscellaneous Metals | 6/14 | 6/30 |

Note:  Schedule based upon award being made on Friday 2/26/99.

LH 01444

B23



630 W. Division St. • Suite 202 • Dover, DE 19904 • 302-677-1965/Office • 302-677-1969/Fax
Professional Builder • Land Development • Residential Construction • Light Commercial

February 26, 1999

Mike Williams
East Coast Erectors Inc.
1144 River Road
New Castle, DE 19720

RE:    Catalog Resources – Enterprise Business Park
       Dover, DE

Dear Mr. Williams:

By way of this letter, it is the intent of Lighthouse Construction, Inc. to award the following work to your company:

| | | |
|---|---|---|
| 1. | Base Bid: | $1,039,000.00 |
| 2. | Alt. No. 1 – Two (2) additional dock leveler frame | $     800.00 |
| 3. | Alt. No. 2 – White primer on underside of dock | $  23,000.00 |
| 4. | Alt. No. 3 – F. & I Metal Studs | $  49,000.00 |
| 5. | Alt. No. 4 – Reinforce existing 200 LF of roof | $    4,160.00 |
| | **TOTAL** | $1,115,960.00 |

We will be forwarding a contract (AIA A401) for your review and execution. The contract will include the IFB, ECE Quote, and minutes from meeting on February 25, 1999.

If you have any questions, please do not hesitate to give me a call.

Sincerely,

Michael McKone

EXHIBIT
MacLeish-26
DEBRA J. WEAVER
3-16-05

LH 01445

B24

Exhibit "D"

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
- - - - - - - - - - - - - - - - - - - -x

FEDERAL INSURANCE                          :
COMPANY a/s/o                              :    CIVIL ACTION
EZIBA.COM./AVACET,                         :
INC., EZIBA                                :    NO. 04-339
SECURITIES CORP.,                          :
          Plaintiff(s),                    :
              v.                           :
LIGHTHOUSE                                 :
CONSTRUCTION, INC.,                        :
BECKER MORGAN GROUP,                       :
INC., and O'DONNELL,                       :
NACCARATO &                                :
MACINTOSH, INC.,                           :
          Defendant(s).                    :
- - - - - - - - - - - - - - - - - - - -x

MILLERS CAPITAL                            :
INSURANCE COMPANY                          :    CIVIL ACTION
a/s/o DEL-HOMES                            :
CATALOG GROUP, LLC,                        :    NO. 04-1322-JJF
          Plaintiff(s),                    :
              v.                           :
LIGHTHOUSE                                 :
CONSTRUCTION, INC.,                        :
BECKER MORGAN GROUP,                       :
INC., and O'DONNELL,                       :
NACCARATO &                                :
MACINTOSH, INC.,                           :
          Defendant(s)                     :
and                                        :
LIGHTHOUSE                                 :
CONSTRUCTION, INC.,                        :
          Defendant and                    :
          Third-Party                      :
          Plaintiff,                       :
              v.                           :
EAST COAST ERECTORS,                       :
INC.,                                      :
          Third-Party                      :
          Defendant.                       :
- - - - - - - - - - - - - - - - - - - -x

COPY

B25

2

1              Oral deposition of ROBERT C.

2    MacLEISH, held at the law offices of

3    CHRISSINGER & BAUMBERGER, 3 Mill Road,

4    Suite 301, Wilmington, DE 19806, on

5    Wednesday, March 16, 2005, beginning at

6    10:08 a.m., before Debra J. Weaver, a

7    Federally Approved RPR, CRR, CSR of NJ

8    (No. XI 01614) and Delaware (No. 138-RPR,

9    Expiration 1/31/08), and a Notary Public

10   of New Jersey, Pennsylvania and Delaware.

11

12

13

14

15

16

17

18

19

20

21

22            ESQUIRE DEPOSITION SERVICES

           1880 John F. Kennedy Boulevard

23                 15th Floor

         Philadelphia, Pennsylvania 19103

24              (215) 988-9191

B26

ROBERT C. MACLEISH

previously Bates stamped LH 04745.

And each of these drawings

were referred to by Mr. MacLeish

in his testimony.

BY MR. PINGITORE:

Q.    Is that correct, Mr.

MacLeish?

A.    Yes, sir.

Q.    Mr. MacLeish, I'm going to

show you a few more documents for

identification.

First is a four-page

document previously Bates stamped LH

01441 through LH 01444, and I ask if you

could please identify the document for

the record.

MR. HILL:    What number is

that?

MR. PINGITORE:    I'm going to

give you a copy.  I'm going to try

and get these documents

identified, so you can follow me.

BY MR. PINGITORE:

Q.    Do you recognize this

ROBERT C. MACLEISH

document, Mr. MacLeish?

    A.    Yes, sir.

    Q.    Can you identify the
document for us?

    A.    Yes, sir.  It's a proposal
from East Coast Erectors dated February
23rd, 1999.

    Q.    And is this for the 1999
building?

    A.    Yes, sir.

    Q.    This would be in response to
your solicitation for bids?

    A.    Yes, sir.

    Q.    In the first paragraph, the
writer indicates that the price is "per
your drawing A2.1 and specifications
dated February 8, 1999."  Do you see
that?

    A.    Yes.

    Q.    Were those the documents
that you provided to prospective bidders?

    A.    Yes.

    Q.    Did you provide any
documents beyond the A2.1 specifications

B2B

ROBERT C. MACLEISH

and February 8, 1999, specifications?

     A.    No, sir.

     Q.    And it was subsequent to this February 23, 1999, proposal that East Coast requested you furnish them with the Varco-Pruden plans for the 1995 building?

     A.    Ask that again.

     Q.    Was it subsequent to this proposal dated February 23, 1999, that East Coast asked you to furnish them with a copy of the Varco-Pruden plans for the 1995 building?

     A.    You mean after that date, had they requested those drawings; is that correct?

     Q.    Yes.

     A.    Yes.

     Q.    I just want to make sure I follow the timeline.

     And if you turn to page three of the document, please, LH 01443 is the Bates stamp number.

     A.    Yes.

ROBERT C. MACLEISH

Q.    I see there is a $4,160 option for reinforcing bar joists.  Do you see that?

A.    Yes.

Q.    To your understanding, is that the option to reinforce the 1995 building?

A.    Yes.

Q.    And to your understanding, at the time this proposal was submitted, East Coast had its -- had -- strike that.

At the time this proposal was generated, on February 23, 1999, is it your understanding that East Coast only had the A2.1 drawing and your specifications dated 2/8/99?

A.    Yes.

Q.    Did East Coast, at any time, explain to you how they arrived at the $4,160 to reinforce the existing bar joists?

A.    No.

MR. PINGITORE:  If we could please mark this as the next

B30

ROBERT C. MACLEISH

exhibit.

(Whereupon, Deposition

Exhibit No. MacLeish-25, Letter

dated 2/23/99 to Robert MacLeish

from Mike Williams, Bates LH

01441-01444, was marked for

identification.)

BY MR. PINGITORE:

Q.    But we at least know that it

was after this proposal that East Coast

asked for structural details on the 1995

building, correct?

A.    Yes.

Q.    I'm going to show you

another document, a single-page document

previously Bates stamped LH 01445.

Can you identify that

document for us?

A.    Yes, sir.  It's a letter

dated February 26th, 1999.  It's on

letterhead from Lighthouse Construction

and it's addressed to Mike Williams from

East Coast Erectors.

Q.    And do you recognize Mr.

ROBERT C. MACLEISH

McKone's signature below?

A.      Yes, sir.

Q.      Okay.  Would this document
indicate Lighthouse's acceptance of East
Coast's proposal to design and construct
the 1999 building?

A.      Yes.

Q.      And you accepted the $4,160
option to reinforce the existing roof,
correct?

A.      Yes, sir.

Q.      And we're still at a point
in time when East Coast does not yet have
the structural drawings for the 1995
building, correct?

A.      They do not have them in
their possession, no.

Q.      Did they have the benefit of
a site visit at this time?

A.      Yes.  Everybody did.

Q.      Had they already visited the
1995 building at this time?

A.      I don't know if they did or
did not.  We didn't ask that.

Exhibit "E"

# C. N. Timbie Engineers, Inc.

P.O. Box 158
47 South Lansdowne Avenue
Lansdowne, PA 19050-0158
Tel: (610) 626-0600
Fax: (610) 622-4296
ChasTimbie@aol.com

July 8, 2005

Mr. Ron L. Pingitore, Esquire
White and Williams LLP
1800 One Liberty Place
1650 Market Street
Philadelphia, PA 19103-7395

Re:  Del-Homes Catalog Group, LLC
     97 Enterprise Place, Dover, Kent County, DE
     DOL 2/17/03
     CNT File 03016

Dear Mr. Pingitore:

On Thursday, February 20, 2003 and on subsequent occasions I
examined the collapsed building at the above referenced
location at the request of Bill Schmidt of your office on
behalf of the property insurer, Miller's Mutual, to
determine the cause of damage.  I have also reviewed
architectural and structural drawings for the building and
for an adjacent addition and have read the transcripts of
the depositions of Robert MacIntosh, Joseph Anastasi, Robert
MacLeish, Michael Williams, Earnest Olds and Gregory Moore,
with exhibits.  I have reviewed erection drawings prepared
by Varco Pruden and drawings by A. F. Manns, architect for
the 1995 building as well as drawings for the 1999 addition
by Becker Morgan Moore Olds & Richter, architects and
O'Donnell Naccarato & MacIntosh, engineers.  I have examined
photographs taken by Thomas Destafney and reviewed the file
from SMI Joists.  I have referred to engineering manuals
such as BOCA 96, ANSI A7 95 and the AISC steel construction
manual.  This report outlines my findings to date.

**MMG1370**

B33

July 8, 2005
Mr. Ron L. Pingitore
Page 2


1.   **Description of the Building**

The building was constructed in the West Dover
Industrial Area in 1995 for Catalog Resources
Group/Clientlogic, a mail order catalog company. The
front of the building is a two story 48,000 square foot
office. The remainder of the building is a 76,000
square foot warehouse used for product storage. The
building was a pre-engineered metal building designed
by Varco Pruden. Pre-engineered buildings are
purchased with the understanding that the structural
design, fabrication and delivery of the steel building
to the site is part of the purchase contract. The
architect for the building was A. F. Manns Associates
of Wilmington, DE. The pre-engineered metal building
was provided by J.W. Walker & Sons who subcontracted
the erection to East Coast Erectors.

The roof was constructed with steel roof joists
designed by SMI Joists with a 1-1/2 inch corrugated
metal deck, 2 inch loose laid foam insulation boards,
an EPDM rubber membrane and stone ballast. The joists
were bearing on tapered steel rafters supported by
exterior tapered columns and interior three-plate
columns. The upper office floor was constructed with
steel floor joists, corrugated steel form and a 3 inch
concrete slab.

The roof of the building sloped at a pitch of 1/4" per
foot toward the east. The intent of the owner was to
connect this building to an existing building located
just west of the new building by constructing a future
linking building between the two. As Catalogue
Resources grew, Del-Homes was asked to construct a
larger addition to the building on the east side of the
existing structure rather than on the west side.

**MMG1371**

B34

July 8, 2005
Mr. Ron L. Pingitore
Page 3


2.  **Addition to the Building in 1999**

The addition to the Catalog Resources building was
larger and taller than the original building.  It was
constructed by Lighthouse Construction.  Lighthouse
engaged East Coast Erectors to provide the design,
materials and erection of the structure.  The building
was designed by Becker Morgan Moore Olds and Richter,
architects, and O'Donnell Naccarato & Macintosh,
Wilmington, DE, structural engineers.  This building
was constructed with conventional framing of open web
steel roof joists and hot rolled continuous steel
girders.  It survived the snow storm with minimal
damage.

The new addition was constructed along the low side of
the roof slope of the 1995 building and was taller than
that building effecting the older building in two
respects, each of which had to be addressed by the
designers of the adjacent new addition.

Firstly, the roof of the new building was higher than
the older building resulting in a 200 foot long offset
wall between the two buildings varying in height from 3
feet at the north end to 5 feet at the south end.  This
created a configuration where snow could scour from the
higher roof and be deposited as a snow drift on the
lower roof.  Roof drifting can be accommodated by
building a lower drift bay in the new building to place
the drift in the new structure where the designer has
control of the new roof construction.  Alternatively,
the edge of the new roof could slope in the profile of
a drift lessening the snow loading on the existing
roof.  The third more common option is to analyze the
existing lower building and strengthen all structural
components where necessary to comply with the current
code.

Secondly, the roof of the 1995 building slopes toward
the new building.  Internal roof drains were required
to evacuate the roof rain water which was directed

**MMG1372**

B3S

July 8, 2005
Mr. Ron L. Pingitore
Page 4

toward the higher building.  Roof drains were installed
along the roof offset to collect the water into a 10
inch diameter PVC drain pipe which was suspended from
the first joist from the offset wall and from trapeze
at the drains, discharging the water into a storm drain
at the rear (north end) of the building [Photo 134-
141].  The drains were located about 2 feet from the
east edge of the roof placing them under the deepest
part of the code predicted snow drift.

3.    **Survey of the 1995 Building in 1999**

The structural engineering consulting firm, O'Donnell,
Naccarato & MacIntosh, which designed the new addition
accepted the responsibility to review and strengthen
the original 1995 building.  The 1996 BOAC code states:

> **1614.2 Additions:** The *addition* to an existing
> structure shall not increase the force in any
> structural element of the existing element by more
> than 5 percent, unless the increased forces on the
> element are still in compliance with this code for
> new structures.  The addition shall not decrease
> the strength of any existing structural element of
> the existing structure to less than that required
> by this code for new structures.

When designing structural modifications to a commercial
building of this size it is good engineering practice
to survey the structure before performing the analysis.
It is not unusual for structural modifications and
structural damage to occur which should be surveyed.
Build owners and tenants may install equipment over the
years making the structures heavier as time passes.

O'Donnell, Naccarato & MacIntosh obtained Varco
erection drawings and calculations from East Coast to
work from in performing the structural analysis.  No

**MMG1373**

B36

July 8, 2005
Mr. Ron L. Pingitore
Page 5

one from O'Donnell, Naccarato & MacIntosh actually went
to the building to survey.  They relied on the drawings
and a verification that the drawings were "as built"
from the steel erector, East Coast.  Had a qualified
structural engineer inspected the building, Varco
drawings in hand, they would have or should have
discovered the following:

1.  The continuous tapered roof rafters are more
    4 feet deep with flanges only 6 inches wide
    and 3/8 inch thick over the interior columns.
    These slender beams require bracing at the
    columns to prevent roll of the rafter.  Under
    load a hinge forms at the top of the column
    causing the column to drift laterally
    allowing the rafter to roll and collapse.
    Properly located stiffeners with a moment
    connection between the column and beam could
    be used in some instances.  In this building,
    the bearing stiffeners did not align with the
    column flanges or column web below the beam
    flange rendering the beam to column
    connection as a normal pinned connection.
    The column to beam connection was a hinge
    requiring lateral bracing.  The bottom flange
    of a continuous rafter is in compression over
    the columns.  Compression flanges attempt to
    shed loading by buckling laterally.  The
    column offers no resistance to this lateral
    buckling and would drift laterally with the
    beam flange.  To prevent roll of the rafter
    and to decrease the unbraced length of the
    compression flange, lateral flange braces are
    required at the columns.  The Varco drawings
    show a cluster of 6 bottom flange braces at
    each interior column.  They were to be
    located on each side of the rafter at each
    interior column and on each side of the
    rafter 5 feet from the column.  The two
    braces at the column, the most critical, were
    not installed.  Omission of the braces at the
    columns made the rafter vulnerable to
    compression flange buckling and roll of the
    rafters over the columns.  There was no

MMG1374

B37

July 8, 2005
Mr. Ron L. Pingitore
Page 6

ceiling in the building and this defect would be evident, especially when comparing the existing structure with the Varco drawings.

2. The roofing on the building was a ballasted EPDM membrane over loose laid insulation on metal decking. The ballast provides 10 pounds per square foot of weight to hold the membrane in place resisting wind uplift. This additional weight was not considered in the O'Donnell, Naccarato & MacIntosh review of the building because they had no knowledge of its existence in 1999. There is a roof hatch leading to the roof and the type of roof system on the building would easily have been determine during a field survey.

3. The roof framing drawing do not indicate a joist size. A field survey would have been helpful. Every joist on the roof has a metal tag with the manufacturer's name (SMI Joists Co. Inc.), the project number (D51998-2), and the joist mark (eg K8). The actual size could be obtained from the joist manufacture with this information.

4. **Review of the Existing Roof Joists**

The roof was framed with open web steel joists placed generally on 5 foot centers spanning 50 feet between rafters. Steel joist sizes are designated with three terms such as 30K10. The first term, 30, indicates the depth of the joist, 30 inches. The second, K, indicate which joists specification applies to this joist for determining such aspects as bearing details, materials used and bridging requirements. The last term refers to the structural performance of the top and bottom chords. The Steel Joist Institute publishes standard joist tables

MMG1375

B38

July 8, 2005
Mr. Ron L. Pingitore
Page 7

indicating the strength of standard joist size
designations.

My own review indicated that the joists used in
the 1995 building had a strength between a 30K8
and 30K9 joist designation. In reviewing the roof
it would be appropriate to use the lower rated
30K8 or to obtain the size from the manufacturer.

The joist manufacturer for this building does not
limit their joists to the discrete standard
designations. They manufacture joists custom to
each roof project. The joists on this project
were, in fact, of a strength between a 30K8 and
30K9 with a design total load of 228 pounds per
linear foot (plf) and design live load of 150 plf.
The design loads would therefore be 30 psf live
load and 15.6 psf dead load. Joists over the
office area were designed for higher snow drift
loading behind the south wall parapet where a
ground snow load of 25 PSF was used.

5. **Snow Drifting on the Low Roof**

When a high roof is built next to a lower roof
consideration should be given to a snow event
where snow is scoured off of the higher roof and
falls into an area of aerodynamic shade along the
leeward side of the offset in the roof. The size
of the resulting drift depends on the geographical
location of the building, the surrounding
resistance to wind, the height of the roof offset
and the reach for scour on the higher roof.

**MMG1376**

B39

July 8, 2005
Mr. Ron L. Pingitore
Page 8

Analysis of the drift at the offset created by the
1999 building was performed using the 1996 BOCA
code.  The factors used were as follows:

$p_g$ = 20 psf      Ground snow load
$h_r$ = 5.0 ft      Roof offset
$W_b$ = 500 ft      Length of reach of upper roof
$I$ = 1.0      Importance of structure
$C_e$ = .7      Exposure to wind

The results is a design snow depth on the low roof
at the offset equal to the offset wall height with
a weight of 83 psf.  The design drift slopes down
to the uniform snow depth of .84 feet on the flat
roof portion of the roof about 16.6 feet from the
offset wall.  This drift represents the minimum
code design load.  Considering the factor of
safety one would expect collapse of a properly
designed roof at about 1.5 times the design load
or for 18 psf dead load, 10 psf stone ballast and
83 psf drift load the expected collapse load would
be about 167 psf at the high point of the drift.

6.   **Strengthening of the 1995 Building**

After their review of the existing building
O'Donnell, Naccarato & MacIntosh recommended
installation of a cold rolled 8 inch deep, 12 gage
zee purlins between the existing columns about one
foot from the existing eave purlin [shown red in
Photo 133].  This was apparently an arbitrary
decision as the one page calculation does not
reach a conclusion that this purlin is required.

The new steel was to be supported by steel angles
at each end.  This new purlin was intended to help
support the eave purlin.  The joists were thought
to be adequate with no additional support.  The
O'Donnell, Naccarato & MacIntosh sketch attached
                                                    as

**MMG1377**

B40

July 8, 2005
Mr. Ron L. Pingitore
Page 9

Exhibit 7 indicates the recommended stiffening of
the roof for snow drifting.

The repair sketch was not signed or sealed.  It
was not included in the permit set of drawings and
did not have the benefit of a review by the local
code official or building inspector.


7.    **Roof Drainage Modifications**


Constructing the new building east of the 1995
building created a condition where the roof of the
old building sloped toward the new building.  The
gutter system would have to be replaced by an
interior drain system.  New drains were installed
about two feet off of the offset wall.  The roof
water from those drains was collected into a 10
inch diameter PVC drain pipe which was suspended
below the roof.  The main pipe was suspended from
the first joist from the offset wall with clevice
hangers [Photo 137].  The drain leaders were
suspended from unistrut trapeze hangers which were
attached to the first joist and to the bottom
flange of the added zee purlins [Photo 138].

The added drains had two structural implications.
Firstly, the weight of a filled 10 inch pipe is
about 36 plf.  This would reduce the capacity of
the joist from which it is suspended by 36 plf.
Secondly, the drains were buried in the deepest
part of any snow drift deposited at the offset
wall.   Roof water flowing across the 200 foot
roof could encounter a significant snow drift
before reaching the drains.  This could result in
ponding at or under the drift.  There is no
evidence that either consequence was addressed in
the 1999 repair recommendation.

B41

July 8, 2005
Mr. Ron L. Pingitore
Page 10

8.    **Cause of the Collapse**

On February 17, 2003, at about 6:35 am, the
building collapsed.  On that date snow was falling
with a northeasterly wind.  The wind scoured snow
off of the high roof reaching to the far northeast
corner, depositing snow as a drift onto the lower
roof according to meteorologist Dr. Lowell
Krawitz, our weather consultant.  The drift would
have been maximum height along the highest end of
the roof offset with a maximum weight of the snow
estimated to be 67.7 psf.  The drift would extend
approximately 17 feet from the offset wall.

Using the BOCA defined drift design the minimum
design load for a drift at that location is 83 psf
extending 16.6 feet from the offset wall to meet
the uniform accumulation of snow on the roof.
That uniform design snow depth is .84 feet, about
10 inches deep weighing 14 psf.  Under the weight
of this drift the total dead load and snow load at
the first joist line would be 397 plf.  The total
load on the second joist line would be 353 plf.
This loading exceeds the allowable loading on the
as-built joist (228 plf) as well as the higher
rated 30K9 (245 plf) and 30K10 (291 plf).  It is
evident that the roof joists were severely
overloaded under the weight of this drift.

The weakest component of this area of roof framing
is the connection of the wind strut to the wind
column [e.g. Photo 48, 98].  This strut was welded
to the center of four joists and bolted to the
wind column using four 1/2 inch diameter bolts.
The wind struts and wind columns were not designed
for gravity loads as is evident from the Varco
calculations.  With the snow accumulating on the
roof this connection would have failed in shear.
Photos 29 and 34 indicate how little resistence
the connection gave to gravity loads as the roof

**MMG1379**

1342

July 8, 2005
Mr. Ron L. Pingitore
Page 11

has collapsed but the wind columns remain
standing.  Photos 53 and 54 show no distortion of
the connection plate at the end of a wind strut
along the offset wall.

With the failure of the wind strut connection the
joists lose any support at mid span that the wind
strut may have provided.  As snow accumulated the
joists at the five foot roof offset were
overloaded and deflected at mid-span similar to
that shown in Photo 110.  The most traumatically
disturbed area of the roof was at the five foot
offset where the roof was torn open [Photo 48 to
57].  The added zee purlin provided little support
of the roof.  The wall was unintentionally
providing support to the edge of the roof, not the
added purlin.

With the roof failure along the offset, collapse
worked progressively across the building, weakened
by missing compression flange bracing, as lateral
movements and stresses radiated from the first
collapse by structural members and bracing rods
which were laced through the roof structure.  The
office roof survived as it was unintentionally
supported by the demising wall between the
warehouse and office.  The roof joists along the
south parapet had been designed for a higher drift
load and these joists survived the storm.
Additionally, the interior columns in the office
area were laterally braced by the mezzanine floor
providing resistance to lateral buckling and roll
of the rafter.

9.    **Conclusions**

The building collapsed under the burden of
drifting snow along the roof offset.  When the
1999 building was designed O'Donnell, Naccarato &
MacIntosh was charged with and accepted the

**MMG1380**

B43

July 8, 2005
Mr. Ron L. Pingitore
Page 12

responsibility to review the existing building and
provide the design for drifting snow on that
building resulting in the construction of the new
building.  The investigation and repair
recommendation was deficient in the following
ways:

1.   Investigating the strength of an existing
     commercial building of this size should have
     started with a field survey.  There were no
     ceiling or wall coverings in the portion of
     the warehouse along the offset.  A walk-
     through inspection of the building would have
     revealed:

     a.   The roof was an EPDM loose laid system
          with 10 pound per square foot ballast.
          The implications of ballast on the roof
          alone would have been a red flag
          according to Mr. Anastasi, the design
          engineer from O'Donnell, Naccarato &
          MacIntosh.  The 10 pound ballast reduced
          the available joist capacity for snow
          loads considerably.  The roof hatch
          makes the discovery of ballast quite
          easy.

     b.   The drawings received from East Coast
          indicate a cluster of six flange braces
          at each column.  The two located
          directly over the columns were missing
          and the stiffeners were not aligned for
          column continuity.  This defect was
          easily discoverable.

     c.   The first joist is spaced at 4'-9".  The
          remainder of the roof has a joist
          spacing of 5'-0", not 4'-9" as indicated
          on the drift calculations.

2.   The O'Donnell, Naccarato & MacIntosh proposal
     included two site visits to the new building.
     Had these visits been executed with an
     examination of the work in the existing
                              building, the

**MMG1381**

β44

July 8, 2005
Mr. Ron L. Pingitore
Page 13

  inadequacy of the repair would have been
  realized.

3. Rather than survey the building the engineers
  relied on the erection contractor to verify
  the information on the Varco drawings, not
  someone from their office familiar with the
  engineering issues related to the snow drift
  analysis.

4. The snow drift calculation for the 1995
  building was flawed in that low side of the
  roof was used for the drift height.  Using
  the offset height of 5 feet rather than 3
  feet results in a considerably heavier and
  wider drift.  Also, the use of a scour reach
  of 200 rather than 500 and considering this a
  parapet configuration indicates an
  unfamiliarity with the intent of the code on
  the part of the designer.

5. The recommended repair stopped at the end of
  the roof offset even though it is logical
  that the drift would continue into the next
  bay.  The repair should have extended for
  another bay to support the extended drift.

6. The roof rafters were not part of the
  O'Donnell, Naccarato & MacIntosh roof
  strength analysis.  By including the rafters
  the bracing defect would have been
  discovered.

7. It is normal practice for a licenced engineer
  to review the work of an unlicenced employee,
  including at least the design criteria used
  in the calculation.  O'Donnell, Naccarato &
  MacIntosh's own calculation sheets have
  initial space for "calculated by" and
  "checked by" at the top.

8. A structural review and repair recommendation
  for a commercial building of this size should
  have been signed and sealed as a part of a
  permit set for the review by the local

**MMG1382**

B46

July 8, 2005
Mr. Ron L. Pingitore
Page 14

building official.  Requesting the back-up
calculation may have resulted in the
discovery of the deficiency of the repair.

9.   Consideration of the flow of water toward the
snow drifting area and the weight of the
water filled drain pipe was not considered.

10.  Rather than installing one line of light gage
purlins, a more appropriate repair for the
roof would be installing new joists or
equivalent steel beams between the first
three joists.  This would double the strength
of the roof under the drift area and would
cut the metal deck span in half.

A more thorough investigation and analysis and
providing the Code Official with the proposed
repair would have prevented collapse under the
drifted snow.  A series of errors and overlooked
aspects of the roof review cumulatively led to
inadequate roof support at the drift.  Defects in
the building allowed a local collapse to progress
across the roof.

9.   **Post Collapse Review of the Roof**

I have reviewed the post collapse calculations and
have the following comments.

1.   It would be most logical to use the worst
condition when reviewing the roof even in a
bay by bay analysis.  The worst case would be
the 5 foot depth at the south end of the
offset.

MMG1383

B47

July 8, 2005
Mr. Ron L. Pingitore
Page 15

2.  Each of the O'Donnell, Naccarato & MacIntosh
    analyses indicate that the joists were
    overloaded in the drift area and repairs to
    the roof were required as indicated on
    Exhibit 6.

3.  The rafters were not included in the
    O'Donnell, Naccarato & MacIntosh review.

These opinions were reached within a reasonable degree
of engineering certainty.  Since discovery is
continuing, these opinions are preliminary.  If you
have any questions or require additional information
please feel free to contact our office.

Very truly yours,

Charles N. Timbie, P.E.
Structural Engineer

Exhibits:

1.  1996 BOCA snow excerpt
2.  Varco S-26 of 39 and S-5 of 39
3.  Varco load certification
4.  ONM snow drift calculations
5.  Calculation comparison chart
6.  ONM roof repair sketch
7.  MBMA snow load table
8.  SMI Joist calculation sheet fo K8 and K16
9 . SJI Load table
10. Photographs

**MMG1384**

B48