Exhibit "F"

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| FACTORY MUTUAL INSURANCE COMPANY, a/k/a FM GLOBAL a/s/o Catalog Resources, Inc. d/b/a ClientLogic, a subsidiary of ClientLogic Operating Corporation 1301 Atwood Avenue Johnston, R.I. 02919 | : : : : : : : | C.A. No.  0 5 - 9 6 - " |
| THE HARTFORD a/s/o Vivre, Inc. 690 Asylum Avenue Hartford, Connecticut 06155 Plaintiffs, | : : : : : : | |
| v. | : | |
| EAST COAST ERECTORS, INC. 1144 River Road New Castle, DE 19720 And | : : : : : : | JURY TRIAL DEMANDED |
| LIGHTHOUSE CONSTRUCTION, INC. 1201 College Park Drive Dover, DE 19904 And | : : : : : : | |
| BECKER MORGAN GROUP, INC. 738 S. Governors Avenue Dover, DE 19904 And | : : : : : : | |
| O'DONNELL, NACCARATO & MACINTOSH, INC. 300 Delaware Avenue Suite 820 Wilmington, DE 19601 Defendants. | : : : : : : : : | |

**COMPLAINT**

153354-1

1.     Plaintiff, FACTORY MUTUAL INSURANCE COMPANY a/k/a FM GLOBAL, (hereinafter "FM Global") is a Rhode Island domiciliary, authorized to conduct the business of insurance in the State of Delaware, with its primary place of business located at 1301 Atwood Avenue, Johnston, Rhode Island, 02919.

2.     Catalog Resources, Inc. d/b/a ClientLogic, (hereinafter "ClientLogic"), a subsidiary of ClientLogic Operating Corporation, is headquartered in Nashville, Tennessee, and was, at all times material hereto, insured by FM Global for certain loss and damage to property pursuant to the terms and conditions of FM Global's policy of insurance.

3.     ClientLogic is a leading international business process outsourcing (BPO) provider of customer care, fulfillment, item processing and marketing services such as order and payment processing, warehousing, inventory management, order pick, pack and ship; eCommerce, catalog, continuity services and returns processing activities.

4.     Plaintiff, THE HARTFORD, (hereinafter "Hartford") is a corporation domiciled in Connecticut, authorized to conduct the business of insurance in the State of Delaware and maintains its primary place of business at 690 Asylum Avenue, Hartford, Connecticut.

5.     Vivre, Inc. (hereinafter "Vivre"), is in the business of, inter alia, catalogue sales of luxury consumer items and was, at all times material hereto, insured by Hartford against certain loss and damage to property according to the terms and conditions of the Hartford policy of insurance.

6.     On February 17, 2003 and prior thereto, Vivre was a customer of ClientLogic from whom Vivre obtained various fulfillment services such as warehousing of Vivre merchandise and other property at the premises of 97 Commerce Way, Dover, Delaware.

153354-1

B50

7.     Defendant Lighthouse Construction, Inc., (hereinafter "Lighthouse Construction") is incorporated under the laws of Delaware with its primary place of business located at 1201 College Park Drive, Dover, Delaware, and at all times hereinafter was in the business of, inter alia, general contracting and construction.

8.     Defendant East Coast Erectors, Inc., (hereinafter "East Coast") is incorporated under the laws of Delaware with its primary place of business at 1144 River Road, New Castle, Delaware, 19720, and at all times hereinafter was in the construction and steel erection business.

9.     Defendant Becker Morgan Group, Inc., f/k/a Becker Morgan Moore Olds & Richter, Inc., (hereinafter "Becker Morgan"), is a Maryland corporation with its primary business address at 738 S. Governors Avenue, Dover, Delaware, and was at all times hereto engaged in the business of, inter alia, design architecture and engineering of buildings and other structures.

10.    Defendant O'Donnell, Naccarato & Macintosh, Inc., (hereinafter "O'Donnell") is incorporated under the laws of Delaware with its primary place of business at 300 Delaware Avenue, Suite 820, Wilmington, Delaware, and was at all times hereinafter engaged in the business of, inter alia, structural design and engineering.

## JURISDICTION AND VENUE

11.    The jurisdiction of this Court is based upon diversity of citizenship pursuant to 28 U.S.C. §1332. The matter in controversy, exclusive of interest and costs, exceeds the sum of Seventy-Five Thousand ($75,000.00) Dollars. Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(a).

B51

## FACTS

12.    Del-Homes Catalog Group, LLC (hereinafter "Del-Homes"), owned and/or operated certain real estate in Dover, Delaware known as the Enterprise Park, including the premises at 97 Commerce Way.

13.    In or around 1995, Del-Homes entered into a lease with Catalog Resources, Inc., ClientLogic's predecessor, for approximately 100,000 square fee of space in a newly completed building addition at 97 Commerce Way.

14.    The Catalog Resources ("CRI"), premises were housed within a 200' X 500' rectangular pre-engineered metal building, which has sometimes been referred to as "Building 1" or the "1995 building."

15.    Building 1 was designed with a single-slope or shed style roof, which rose to a peak elevation of 28 feet at its intersection with the south building sidewall and dropped to its lowest elevation of 23' 10" at the eave of the north sidewall.

16.    In or about 1999, ClientLogic purchased CRI, succeeded to CRI's rights under its lease with Del-Homes and took possession of the premises at 97 Commerce Way previously occupied by CRI.

17.    At about this same time, Del-Homes decided to expand the Building 1 facility by constructing a 250,000 square foot addition, which was designed to abut Building 1 along its "north" (or east) sidewall for a distance of 200 feet.

18.    Del-Homes contracted with Lighthouse Construction to design, engineer and construct this addition (hereinafter the "1999 building").

19.    Sometime thereafter Del-Homes and/or Lighthouse contracted with Defendant East Coast Erectors to design, engineer and construct the 1999 building addition.

B52

20.    Becker Morgan and/or its predecessor Becker Morgan Moore Olds & Richter, Inc., helped coordinate the project and provided architectural, design and engineering services for the 1999 building addition, including various plans, drawings and specifications.

21.    Defendant O'Donnell, Naccarato & Macintosh, in coordination with Defendant Becker Morgan, provided professional design and engineering services, including structural design and analysis and plans and specifications for the 1999 building.

22.    According to Becker Morgan's design drawings, the "south" (or west) wall of the 1999 Building addition would abut and adjoin the north (or east) wall of the 1995 Building for a distance of 200 feet.

23.    The south wall of the 1999 addition varied between 29 feet 9 inches and almost 28 feet in height, whereas the adjacent north wall of the 1995 building was slightly less than 24 feet high.

24.    Since 1976 most U.S. building codes, including BOCA, have addressed the potential for increased roof snow load caused by drifting under certain circumstances, such as where the roof of a higher building abuts or is within 20 feet of a lower building's roof.

25.    Standard construction practice in 1999 as reflected in the model building codes and design standards, including BOCA and ANSI/ASCE 7-98, required that existing buildings be evaluated for possible increased loads and stresses, including snow loads, caused by the construction of nearby additions or alterations. Owners of an existing lower building are to be advised of the potential for increased snow loads where a higher roof is constructed within 20 feet of an existing structure.

26.    Defendants knew that the higher roof of the 1999 addition posed a potential hazard to the lower existing building occupied by ClientLogic, in that the "step" formed by the addition

653

of the higher wall against the lower roof of the 1995 building would allow for the formation of snow drifts on the existing roof.

27.    Defendants owed a duty to analyze the structure of the 1995 Building to determine if it was adequate to accept the snow drift and other loads imposed by the 1999 addition.

28.    Defendants miscalculated or failed to properly evaluate the size and magnitude of the drifting and increased loading upon the roof of the lower building as a result of, among other things, wind blown snow from the higher roof of the adjacent 1999 building.

29.    Defendants also failed to inspect, or inadequately inspected, the 1995 Building, and failed to properly determine the "as-built" and existing conditions of the 1995 Building structure, including the existing or actual strength or capacity of the 1995 Building's roof, joists and rafters to support the extra roof loads resulting from the 1999 building addition.

30.    The 1999 addition also affected the roof drainage, in that the 1995 building's gutter and downspouts along the 200 feet of eave adjoining the 1999 building wall, would have to be eliminated.

31.    Defendants designed and installed a new drainage system for the 200 feet of Building 1 roof abutting the 1999 building, which consisted of placing new drains through the roof deck of the 1995 building and plumbing those drains to a larger drain manifold line suspended from the existing roof joists and/or rafters.

32.    Defendants neglected to provide the necessary additional bracing or other structural reinforcement to the 1995 building required to withstand the snow drift and other loads caused by the new addition.

33.    On or about February 17, 2003, a snowstorm caused drifting on the roof of the 1995 building in the area of the step adjacent to the wall of the 1999 building.

654

34.    As a consequence of the foregoing and as more particularly set forth below, the roof beneath the drifted area collapsed, as did a substantial portion of the rest of the 1995 Building roof.

35.    As a result of the collapse, ClientLogic and Vivre suffered significant damage to their property and business operations.

36.    Pursuant to the terms and conditions of its contract of insurance, plaintiff, FM Global, has already paid over $4,000,000.00 in compensation and expects the total loss and damage to ClientLogic as a result of the collapse to exceed $5,443,902.00.

37.    Pursuant to the terms and conditions of its contract of insurance, plaintiff, Hartford, has already paid to Vivre as a result of the collapse $184,493.00.

38.    As a result of the aforesaid payments, and pursuant to the contract of insurance and by operation of law, plaintiffs FM Global and Hartford are subrogated to the rights of their insureds against all parties responsible for the occurrence of said damages including, but not limited to, any and all subsequent payments related to the loss suffered.

### COUNT I – Negligence

### Plaintiffs v. All Defendants

39.    Plaintiffs incorporate by reference the allegations of paragraphs 1 through 38 as though fully set forth herein.

40.    The roof collapse and the consequent damage to ClientLogic and Vivre were caused by the negligence and carelessness of defendants, their agents, servants, contractors and/or employees acting within the course and scope of their employment in:

        a.    failing to properly engineer or design for the increased snow loading imposed on the 1995 building as a result of the construction of the 1999 building;

A55

b.    failing to warn of the need to engineer or design for the additional load imposed on the 1995 building as a result of the construction of the 1999 building;

c.    failing to design or engineer the 1999 building in a manner that did not compromise the structural integrity of the 1995 building;

d.    failing to properly inspect the 1995 building for adequate structural stability against snow loads that could and did result from construction of the 1999 building immediately adjacent to the 1995 building;

e.    failing to advise and warn of the necessity to review the design of the 1995 building for the additional loads that could be imposed by the construction of an adjacent higher building;

f.    failing to advise and warn of the necessity to inspect the 1995 building for conformance with the design drawings of the 1995 building in anticipation of additional loading on the 1995 building from construction of the 1999 building;

g.    failing to redesign and/or re-engineer the 1995 building to accommodate the additional load imposed by the construction of the 1999 building;

h.    failing to warn of the increased risks inherent in joining the higher 1999 building with the lower 1995 building;

B 56

i.    failing to specify or install sufficient additional bracing and/or structural reinforcement to counter the additional load imposed on the 1995 building as a result of the construction of the 1999 building;

j.    failing to recognize or perceive the magnitude of the additional drift load imposed on the 1995 building by the construction of the 1999 building;

k.    failing to provide alternative design and/or engineering for the additional load imposed on the 1995 building as a result of the construction of the 1999 building;

l.    failing to properly brace and/or support structural components and/or members of the buildings to support anticipated wind drifted snow load conditions;

m.    failing to select competent and skilled workers and subcontractors to design, engineer, supply and erect the buildings in accordance with industry standards and readily identifiable load conditions;

n.    Providing insufficient supervision and oversight with regard to the design, engineering and construction of the 1999 addition, particularly the structural inspection and analysis of the roof system of the 1995 building, including without limitation, the columns, beams, joists, deck, bracing, roof ballast and drainage.

B57

o.    failing to warn of the inherent defects, known defects, and work product deficiencies that compromised the structural integrity of the 1995 building;

p.    failing to perform the design, engineering and construction of the 1999 and 1995 buildings in a good and workmanlike manner;

q.    failing to comply with applicable codes and standards including but not limited to ANSI/ASCE 7-98, the American Society of Civil Engineers, Minimum Design Loads For Buildings and Other Structures, Section 7.12; and

r.    otherwise failing to use due care under the circumstances.

41.    As a direct and proximate result of the collapse, ClientLogic and Vivre sustained substantial damage to their property.

42.    As a result of the foregoing and pursuant to the terms and conditions of their contracts of insurance, Plaintiffs have made payments to ClientLogic and Vivre as set forth above, the total of which will exceed $5,433,902.00.

**WHEREFORE**, Plaintiffs demand judgment in their favor and against Defendants in an amount in excess of $5,628,395.00 together with costs, pre-judgment interest, attorney fees and such other relief as this court deems appropriate.

153354-1

β57𝒶

## COUNT II – GROSS NEGLIGENCE

### Plaintiffs v. All Defendants

43.    Plaintiffs incorporate by reference the allegations of paragraphs 1 through 42 hereof as if fully set forth at length herein.

44.    By undertaking the design, engineering and construction of the 1999 building, Defendants were under an express and implied duty to prevent any unreasonable risk of harm or injury to the existing building occupied by ClientLogic as a result of the new addition.

45.    Defendants had actual and constructive knowledge that failure to adequately engineer for, and/or reinforce the 1995 Building to carry, the increased roof loads imposed as a consequence of the adjacent 1999 building would expose ClientLogic, its employees, customers, guests, business operations and property, to the unreasonable risk of personal injury and property damage resulting from a roof collapse.

46.    Despite this knowledge and in contravention of their duty to avoid exposing Plaintiffs to an unreasonable risk of harm, Defendants, and their agents, servants, contractors and/or employees acting within the course and scope of their employment, dramatically increased the likelihood of structural overload and collapse of the existing building, consciously disregarded the severity of the injuries and damages that would ensue from a collapse, ignored basic industry knowledge, practice and procedures intended to promote public safety and violated the requirements of the Kent County building code by inter alia:

        a.    ignoring the absence of certain flange bracing in the 1995 building;

        b.    failing to notify or warn others about such defective, deficient structural conditions in the 1995 building;

c.     making inaccurate and unfounded assumptions about the structural
condition and capacity of the 1995 building;

d.     increasing the potential for a catastrophe;

e.     failing to identify, as part of the design, engineering and construction
process, that lateral bracing of the bottom flange of the main frame girders
at the 1995 building column lines was shown on the original drawings for
the 1995 building but were omitted during or subsequent to construction
of the 1995 building;

f.     failing to design and engineer additional load capacity at the interface of
the 1995 and 1999 buildings despite designing and engineering for
additional load capacity on the 1999 building at its parapet wall;

g.     failing to design and engineer adequate drainage devices on the 1995
building where it interfaced with the 1996 building so that rainwater/snow
melt did not compound foreseeable drifted snow loads;

h.     failing to comply with applicable codes and standards including but not
limited to ANSI/ASCE 7-98, the American Society of Civil Engineers,
Minimum Design Loads For Buildings and Other Structures, Section 7.12
by providing additional load capacity for foreseeable drifted snow loads;

I.     failing to consider the potential for reduced roof drainage, the back up of
water or ice on the roof, and the additional loads such water, ice, and
drainage system would place upon the roof; and

j.     failing to consult or retain an engineer to perform hydraulic calculations
related to the internal drains that were intended to remove the build-up of

B57c

rainwater and melted snow from the area where the 1995 and 1999 buildings interfaced.

47.   The grossly negligent conduct of the Defendants, as evidenced by the pattern of negligent acts and/or omissions identified above and herein, was the direct and proximate cause of damages and losses sustained by ClientLogic and Vivre.

48.   As a result of the foregoing and pursuant to the terms and conditions of its contract of insurance, Plaintiff has made payments to ClientLogic and Vivre in excess of $5,443,902.00 for which defendants are liable to Plaintiff.

**WHEREFORE,** Plaintiffs demand judgment in their favor and against Defendants in an amount in excess of $5,628,395.00 together with costs, pre-judgment interest, attorney fees and such other relief as this court deems appropriate.

**McCULLOUGH & McKENTY, P.A.**

BY: _____

Bruce W. McCullough (I.D. No. 3112)
824 Market Street, Fourth Floor
P.O. Box 397
Wilmington, DE  19899-0397
302-655-6749
Attorney for Plaintiffs, Factory Mutual
Insurance Company, a/k/a FM Global a/s/o
Catalog Resources, Inc. d/b/a ClientLogic, a
subsidiary of ClientLogic Operating
Corporation and The Hartford a/s/o Vivre,
Inc.

Dated: February 17, 2005

153354-1

ß51e

OF COUNSEL:

HECKER BROWN SHERRY AND JOHNSON, LLP

Geoffrey W. Veith, Esquire
1700 Two Logan Square, 17th Floor
18th and Arch Streets
Philadelphia, PA  19103
215-665-0400
Attorney for Plaintiffs, Factory Mutual
Insurance Company, a/k/a FM Global a/s/o
Catalog Resources, Inc. d/b/a ClientLogic, a
subsidiary of ClientLogic Operating
Corporation and The Hartford a/s/o Vivre,
Inc.

B 578

Exhibit "G"

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - -x

FEDERAL INSURANCE
COMPANY a/s/o
EZIBA.COM./AVACET,
INC., EZIBA SECURITIES
CORP.,

　　　　Plaintiff(s),

　　　　v.

LIGHTHOUSE
CONSTRUCTION, INC.,
BECKER MORGAN GROUP,
INC., and O'DONNELL,
NACCARATO & MACINTOSH,
INC.,

　　　　Defendant(s).

- - - - - - - - - - - - - - - - - - - -x

MILLERS CAPITAL
INSURANCE COMPANY
a/s/o DEL-HOMES
CATALOG GROUP, LLC,

　　　　Plaintiff(s),

　　　　v.

LIGHTHOUSE
CONSTRUCTION, INC.,
BECKER MORGAN GROUP,
INC., and O'DONNELL,
NACCARATO & MACINTOSH,
INC.,

　　　　Defendant(s)

and

LIGHTHOUSE
CONSTRUCTION, INC.,

　　　　Defendant and
　　　　Third-Party
　　　　Plaintiff,

　　　　v.

EAST COAST ERECTORS,
INC.,

　　　　Third-Party
　　　　Defendant.

- - - - - - - - - - - - - - - - - - - -x

: CIVIL ACTION

: NO. 04-339

ORIGINAL

: CIVIL ACTION

: NO. 04-1322-JJF

2

1          Oral deposition of MICHAEL A.

2    WILLIAMS, held at the law offices of WETZEL &

3    ASSOCIATES, P.A., The Carriage House, Suite

4    201, 1100 North Grant Avenue, Wilmington,

5    Delaware, 19805, on Tuesday, June 14, 2005,

6    beginning at 9:25 a.m., on the above date,

7    before Debra J. Weaver, a Federally Approved

8    RPR, CRR, CSR of NJ (No. XI 01614) and Delaware

9    (No. 138-RPR, Expiration 1/31/08), and a Notary

10   Public of New Jersey, Pennsylvania and

11   Delaware.

12

13

14

15

16

17

18

19

20

21

22          ESQUIRE DEPOSITION SERVICES

          1880 John F. Kennedy Boulevard

23                15th Floor

          Philadelphia, Pennsylvania 19103

24             (215) 988-9191

Esquire Deposition Services

B59

MICHAEL A. WILLIAMS

Q.    In a general sense has anyone?

A.    Yes.

Q.    Who?

A.    Actually, not any specific person, but just hearing testimony in some of these depositions, I'm getting a feel of they're focusing on the snow drift.

Q.    And has anyone shared with you an opinion regarding the weight of the snow, ice and/or water on the roof immediately prior to the collapse?

A.    Immediately prior to the collapse?

Q.    Right.

A.    No.

Q.    Sitting here today, are you aware of any mistakes regarding the erection of the 1995 building?

A.    No.

Q.    Sitting here today, are you aware of any deviations from the erection drawings with respect to the actual condition of the 1995 building as of the time of the collapse?

            MR. HILL:  I'm going to object to

1360

MICHAEL A. WILLIAMS

1              the form of that question.

2    BY MR. PINGITORE:

3         Q.      You can answer it.

4         A.      Am I aware of any deviation from

the erection drawing is your question?

6         Q.      Right.

7         A.      Yes.

8         Q.      What are you aware of?

9         A.      There were braces at the column

10   omitted, which are shown on the erection

11   drawings.

12        Q.      What braces are they?

13        A.      Flange braces.

14        Q.      The lower flange braces?

15        A.      Yes.

16        Q.      And how did that come to be known

by you?

17        A.      My recollection was the quantity

shipped was not consistent with the quantity

shown on the erection drawings, and I was

informed of that by my field people, which I

relayed to Mr. MacLeish and was told that those

braces were not necessary due to a stiffener

added to the girder beam at every interior

B61

MICHAEL A. WILLIAMS

1  column.

2      Q.      And when was this conversation?

3      A.      This would have been probably

4  early in the erection of the '95 building.

5      Q.      And did you have an understanding

6  as to why the stiffener would, at least

7  according to Mr. MacLeish, take the place of a

8  brace?

9      A.      Yes.

10     Q.      Can you explain that to me?

11     A.      The braces are generally used to

12 keep the bottom flange of the girder beams from

13 rotating, and in this case, where they attached

14 to the columns, rotation can't occur there

15 because it's attached to the column.  And then

16 the stiffener was added, I think, to prevent

17 any buckling as well.

18     Q.      And that information that Mr.

19 MacLeish provided you, was it your

20 understanding that he in turn received the

21 information from Varco-Pruden?

22     A.      It was my understanding he

23 received it verbally.

24     Q.      From Varco-Pruden?

114

MICHAEL A. WILLIAMS

1          A.      Yes.

2          Q.      Did you relay any part of that

3    conversation to O'Donnell Naccarato as part of

4    their involvement in the 1999 project and

5    evaluation of the 1995 building?

6          A.      I don't recall.

7          Q.      Just for clarification, you don't

8    recall relaying that information or you didn't

9    relay that information?

10         A.      I don't recall relaying that

11   information.

12         Q.      Is there a reason you wouldn't

13   have relayed that information?

14         A.      Not that I can think of.

15         Q.      And if that information was

16   relayed, it would have been either to Mr.

17   Anastasi or Mr. MacIntosh; is that correct?

18              MR. HILL:   Object to the form of

19         the question.

20              THE WITNESS:   It probably would

21         have been relayed to one of those two,

22         yes.

23   BY MR. PINGITORE:

24         Q.      Other than the flange braces, are

B 63

Exhibit "H"

FABRICATING
ERECTING
WELDING
STRUCTURAL AND
MISCELLANEOUS
STEEL

EAST
COAST
ERECTORS
INC.

1144 RIVER ROAD
NEW CASTLE
DELAWARE 19720
FAX: 302-323-1805
302/323-1800

*104.002*

**LETTER OF TRANSMITTAL**

TO: O'Donnell, Naccarato & MacIntosh

300 Delaware Ave Suite 820

Wilmington, De. 19801

(252) 9200

ATTN: Joe Anastasi

DATE: May 12, 1999

JOB NO.

RE: Catalog Resources

Airborne # 3381131924

GENTLEMEN:

WE ARE SENDING YOU HEREWITH ☐          UNDER SEPARATE COVER          ☐

☐ DESIGN DRAWINGS          ☐ ANCHOR BOLT PLAN          ☐ DECK DRAWINGS
☐ DETAIL DRAWINGS          ☐ SPECIFICATIONS            ☐ OTHER
☐ ERECTION PLANS           ☐ JOIST DRAWINGS

| DESCRIPTION |
|---|
| |
| |
| Varco Pruden 'As Built' Drawings. |
| |
| |

☐ FOR YOUR USE            ☐ FOR FINAL APPROVAL        ☐ APPROVED AS NOTED—RESUBMIT
☐ FOR YOUR APPROVAL       ☐ APPROVED FOR FABRICATION ☐ FOR FILES AND DISTRIBUTION
☐ AS REQUESTED            ☐ APPROVED AS NOTED         ☐ FOR ERECTION
☐ NOT APPROVED—RESUBMIT

REMARKS: _____

_____

_____

_____

_____

SIGNED: Bob Frick

EZ1BA 0214  B64

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
-------------------------x
FEDERAL INSURANCE        : CIVIL ACTION
COMPANY a/s/o            :
EZIBA.COM./AVACET,       : NO. 04-339
INC., EZIBA SECURITIES   :
CORP.,                   :
        Plaintiff(s),   :
          v.             :
LIGHTHOUSE               :        ORIGINAL
CONSTRUCTION, INC.,      :
BECKER MORGAN GROUP,     :
INC., and O'DONNELL,     :
NACCARATO & MACINTOSH,   :
INC.,                    :
        Defendant(s).   :
-------------------------x
MILLERS CAPITAL          : CIVIL ACTION
INSURANCE COMPANY        :
a/s/o DEL-HOMES          : NO. 04-1322-JJF
CATALOG GROUP, LLC,      :
        Plaintiff(s),   :
          v.             :
LIGHTHOUSE               :
CONSTRUCTION, INC.,      :
BECKER MORGAN GROUP,     :
INC., and O'DONNELL,     :
NACCARATO & MACINTOSH,   :
INC.,                    :
        Defendant(s)    :
and                      :
LIGHTHOUSE               :
CONSTRUCTION, INC.,      :
        Defendant and    :
        Third-Party      :
        Plaintiff,       :
          v.             :
EAST COAST ERECTORS,     :
INC.,                    :
        Third-Party      :
        Defendant.       :
-------------------------x

B65

213

1                    Continued deposition of

2    ROBERT MacINTOSH, held at the law offices

3    of CHRISSINGER & BAUMBERGER, 3 Mill Road,

4    Suite 301, Wilmington, DE 19806, on

5    Monday, May 2, 2005, beginning at 9:45

6    a.m., on the above date, before Debra J.

7    Weaver, a Federally Approved RPR, CRR,

8    CSR of NJ (No. XI 01614) and Delaware

9    (No. 138-RPR, Expiration 1/31/08), and a

10   Notary Public of New Jersey, Pennsylvania

11   and Delaware.

12

13

14

15

16

17

18

19

20

21

22            ESQUIRE DEPOSITION SERVICES
             1880 John F. Kennedy Boulevard
                     15th Floor
23        Philadelphia, Pennsylvania 19103
                  (215) 988-9191
24

Esquire Deposition Services

B66

ROBERT MacINTOSH

example of 30K10, is that a designation
that SJI disseminates?

A.      Yes.   And what happens is
every joist that is of that designation,
they can be fabricated of various
components, but they all have to meet a
minimum performance criteria that allows
us, as a designer, to count on that
joist's performance, both from the live
load and total load for the joist -- for
the joist to perform in the life of the
building.

Q.      If the joist isn't
identified as a 30K10 or otherwise, how
do you know what the performance criteria
of the joists are?

A.      You wouldn't know.

MR. PINGITORE:  The last
document, previously marked --
previously Bates stamped Eziba
0214, we'll mark it as
MacIntosh-109.

(Whereupon, Deposition
Exhibit No. MacIntosh-109, Letter

B67

ROBERT MacINTOSH

of transmittal dated 5/12/99 to

ONM from East Coast Erectors

enclosing V-P 'As Built' drawings,

Bates Eziba 0214, was marked for

identification.)

BY MR. PINGITORE:

Q.    Can you identify this

document for me, please?

A.    It looks like a transmittal

from East Coast Erectors to us,

O'Donnell, Naccarato & MacIntosh.

Q.    This went to the attention

of Mr. Anastasi, correct?

A.    Yes.

Q.    It's dated May 12th, 1999,

correct?

A.    Yes.

Q.    This, then, would have been

provided in the context of your design

services for the 1999 building; is that

correct?

A.    Yes.

Q.    And it's signed by Bob

Ick; is that correct?

B68

ROBERT MacINTOSH

A.    Yes.

Q.    Do you recognize Bob Frick, his name?

A.    I recognize it.  He worked for Mike Williams at ECS Erectors.

Q.    Do you remember what position he held with East Coast Erectors?

A.    No.

Q.    And this is titled a letter of transmittal, correct?

A.    Yes.

Q.    Can you tell what it was transmitting?

A.    The description is Varco-Pruden and, in quotes, "as-built" drawings.

Q.    Sitting here today, do you know if Varco-Pruden as-built drawings actually existed for the 1995 building?

A.    I don't know if as-builts existed, no.

Q.    And to your understanding, is the reference to the Varco-Pruden, in

B69

ROBERT MacINTOSH

the description portion of this sheet, a

reference to the 1995 building?

    A.    Yes.   That's my

understanding.

    Q.    Would there be a way for you

to go back in your records and determine

which drawings accompanied this letter of

transmittal?

    A.    I'm not sure at that point

if we were -- if we were that diligent.

    I believe they were the

drawings -- the drawings that we've

referred to, the Varco-Pruden set.

    Q.    I'm just going to show you a

pack of drawings that was previously

marked as MacLeish-62, give you a chance

to look at those drawings.

    And please tell me if you

believe MacLeish-62 is what accompanied

the letter of transmittal that we've

marked as MacIntosh-109.

    A.    Yes, I believe so.

    MR. HILL:  What's the first

    Bates number on that exhibit?

B70

Exhibit "I"

```
 1              UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF DELAWARE
 3    -------------------------x
      FEDERAL INSURANCE         : CIVIL ACTION
 4    COMPANY a/s/o             :
      EZIBA.COM./AVACET,        : NO. 04-339
 5    INC., EZIBA               :
      SECURITIES CORP.,         :
 6            Plaintiff(s),     :
              v.                :
 7    LIGHTHOUSE                :
      CONSTRUCTION, INC.,       :        COPY
 8    BECKER MORGAN GROUP,      :
      INC., and O'DONNELL,      :
 9    NACCARATO &               :
      MACINTOSH, INC.,          :
10            Defendant(s).     :
      -------------------------x
11    MILLERS CAPITAL           : CIVIL ACTION
      INSURANCE COMPANY         :
12    a/s/o DEL-HOMES           : NO. 04-1322-JJF
      CATALOG GROUP, LLC,       :
13            Plaintiff(s),     :
              v.                :
14    LIGHTHOUSE                :
      CONSTRUCTION, INC.,       :
15    BECKER MORGAN GROUP,      :
      INC., and O'DONNELL,      :
16    NACCARATO &               :
      MACINTOSH, INC.,          :
17            Defendant(s)      :
      and                       :
18    LIGHTHOUSE                :
      CONSTRUCTION, INC.,       :
19            Defendant and     :
              Third-Party       :
20            Plaintiff,        :
              v.                :
21    EAST COAST ERECTORS,      :
      INC.,                     :
22            Third-Party       :
              Defendant.        :
23    -------------------------x
24
```

B71

1          Oral deposition of JOSEPH J.

2  ANASTASI, held at the law offices of

3  CHRISSINGER & BAUMBERGER, 3 Mill Road,

4  Suite 301, Wilmington, DE 19806, on

5  Tuesday, May 3, 2005, beginning at 9:35

6  a.m., on the above date, before Debra J.

7  Weaver, a Federally Approved RPR, CRR,

8  CSR of NJ (No. XI 01614) and Delaware

9  (No. 138-RPR, Expiration 1/31/08), and a

10 Notary Public of New Jersey, Pennsylvania

11 and Delaware.

12

13

14

15

16

17

18

19

20

21

        ESQUIRE DEPOSITION SERVICES

22   1880 John F. Kennedy Boulevard

              15th Floor

23   Philadelphia, Pennsylvania 19103

            (215) 988-9191

24

B72

166

JOSEPH J. ANASTASI

A.     Which specific sketch are you referring to?

Q.     I'm referring to page 3 of MacIntosh-66A, which is Bates stamped Eziba 0018.

A.     Yes, I'm familiar with that sketch.

Q.     Okay.  Was that sketch ever reviewed by Mr. MacIntosh, to your knowledge?

A.     I don't know.

Q.     Is there any way we could determine if Mr. MacIntosh reviewed the sketch prior to issuing it to your client?

A.     You could ask him.

Q.     Any way other than that? For example, any type of a log that would show whether or not Mr. MacIntosh reviewed that sketch?

A.     I don't know of any log that would exist for something like that.

Q.     Do you know whether that sketch was ever sealed by Mr. MacIntosh?

B73

JOSEPH J. ANASTASI

A.    That I don't know either.

Q.    Do you know who would know that information?

A.    If he signed it, I would assume he would know that.

Q.    If he signed the sketch?

A.    If he signed and sealed that, he would have a recollection of that.

Q.    Okay.  Do you recall the sketch shown on Eziba 0018 as having ever been incorporated into construction drawings?

A.    No.  That was the final issue of that sketch.

Q.    Do you recall that sketch ever having been incorporated into shop drawings?

A.    I do not recall that.

Q.    Do you recall any conversations that you had regarding that sketch with Mr. MacIntosh prior to it being issued to your client?

A.    No.  I do not recall any

B74

JOSEPH J. ANASTASI

conversations regarding that sketch.

Q.    As far as you know and recall, was Eziba 0018 the only sketch performed with respect to the modifications to the 1995 building?

A.    To my knowledge, yes.

Q.    And that sketch is the sole document, to your understanding, that your client would have to rely on in order to cause the work to be performed in the field?

A.    That's correct.

Q.    Prior to your involvement in this project in 1999, was Mr. MacIntosh aware of your unsuccessful attempts to become a licensed professional engineer?

A.    Yes, he was.

Q.    Have you ever taken the professional engineer exam for the state of Delaware?

A.    No, I have not.

Q.    Prior to your involvement in this project in 1999, was Mr. MacIntosh aware of your lack of experience with

B75

Exhibit "J"



1
2    UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF DELAWARE
3    ----------------------x
     FEDERAL INSURANCE          : CIVIL ACTION
4    COMPANY a/s/o              :
     EZIBA.COM./AVACET,         : NO. 04-339
5    INC., EZIBA SECURITIES     :
     CORP.,                     :
6          Plaintiff(s),        :
              v.                :
7    LIGHTHOUSE                 :    ORIGINAL
     CONSTRUCTION, INC.,        :
8    BECKER MORGAN GROUP,       :
     INC., and O'DONNELL,       :
9    NACCARATO & MACINTOSH,     :
     INC.,                      :
10         Defendant(s).        :
     ----------------------x
11   MILLERS CAPITAL            : CIVIL ACTION
     INSURANCE COMPANY          :
12   a/s/o DEL-HOMES            : NO. 04-1322-JJF
     CATALOG GROUP, LLC,        :
13         Plaintiff(s),        :
              v.                :
14   LIGHTHOUSE                 :
     CONSTRUCTION, INC.,        :
15   BECKER MORGAN GROUP,       :
     INC., and O'DONNELL,       :
16   NACCARATO & MACINTOSH,     :
     INC.,                      :
17         Defendant(s)         :
     and                        :
18   LIGHTHOUSE                 :
     CONSTRUCTION, INC.,        :
19         Defendant and        :
           Third-Party          :
20         Plaintiff,           :
              v.                :
21   EAST COAST ERECTORS,       :
     INC.,                      :
22         Third-Party          :
           Defendant.           :
23   ----------------------x
24

1              Oral deposition of MICHAEL A.

2    WILLIAMS, held at the law offices of WETZEL &

3    ASSOCIATES, P.A., The Carriage House, Suite

4    201, 1100 North Grant Avenue, Wilmington,

5    Delaware, 19805, on Tuesday, June 14, 2005,

6    beginning at 9:25 a.m., on the above date,

7    before Debra J. Weaver, a Federally Approved

8    RPR, CRR, CSR of NJ (No. XI 01614) and Delaware

9    (No. 138-RPR, Expiration 1/31/08), and a Notary

10   Public of New Jersey, Pennsylvania and

11   Delaware.

12

13

14

15

16

17

18

19

20

21

22              ESQUIRE DEPOSITION SERVICES

                1880 John F. Kennedy Boulevard

23                     15th Floor

            Philadelphia, Pennsylvania 19103

24                  (215) 988-9191

B77

MICHAEL A. WILLIAMS

1          Q.      Is there a reason they're not

2    sealed?

3          A.      It's not required.

4          Q.      When is it required that drawings

5    be sealed, if you know?

6          A.      To my knowledge, it's not

7    required by any government or building code.

8          Q.      For shop drawings to be sealed?

9          A.      For shop drawings to be sealed,

10   correct.

11         Q.      Are there other drawings to your

12   understanding that must be sealed?

13         A.      The structural drawings for the

14   project must be sealed.

15         Q.      By a registered engineer?

16         A.      That's correct.

17         Q.      Okay.  Now, as of March 22, 1999,

18   had O'Donnell Naccarato supplied its $20,000

19   worth of engineering services?

20         A.      For the most part, yes.

21         Q.      What services then were not yet

22   complete?

23         A.      I would have to say that by the

24   end of March they probably had not completed

MICHAEL A. WILLIAMS

for payment that we've marked as Exhibit 123,

that the reinforcement of the 1995 building was

completed between May 19, 1999, and June 4,

1999?

A.    Yes.

Q.    Okay.  Let me show you yet

another document, single-page document,

previously Bates stamped ECE 0649.  We'll mark

it as Exhibit 125.

(Whereupon, Deposition Exhibit

No. Williams-125, Sketch from ONM,

Bates ECE 0649, was marked for

identification.)

BY MR. PINGITORE:

Q.    Once you have a chance to

familiarize yourself with the document, please

identify it for the record.

A.    This is a sketch from O'Donnell

Naccarato MacIntosh showing the additional

purlin that was added to the 1995 building.

Q.    Then is the additional purlin

shown as 8Z105?

A.    Yes.

Q.    Do you know who specifically with

MICHAEL A. WILLIAMS

1  O'Donnell Naccarato created this drawing?

2       A.      Joe Anastasi.

3       Q.      And how do you know that Mr.

4  Anastasi created this drawing?

5       A.      I'm familiar with the document

6  and somewhat familiar with his handwriting.

7       Q.      Are you familiar with the

8  document in the context of the 1999 project

9  being undertaken?

10      A.      Yes.

11      Q.      And how was this document used by

12 East Coast, if at all?

13      A.      It was used to procure the

14 materials recommended and to install them.

15      Q.      Would this be considered a

16 construction document?

17      A.      I'm not sure how to answer that.

18      Q.      Well, to your understanding, was

19 this document intended to be used by East Coast

20 in order to construct the additional members to

21 reinforce the 1995 building?

22      A.      Yes.

23      Q.      And was this document then given

24 to East Coast's field personnel in order to

B80

MICHAEL A. WILLIAMS

1  follow in the reinforcement of the 1995

2  building?

3          A.      Yes.

4          Q.      To your knowledge, were any other

5  documents created by O'Donnell Naccarato or

6  East Coast depicting the modifications to the

7  1995 building?

8          A.      I don't recall any.

9          Q.      And to your knowledge, was this

10 document ever sealed by a registered engineer?

11         A.      Not to my knowledge.

12         Q.      Did you ever request that

13 O'Donnell Naccarato seal this document?

14         A.      That I don't recall.

15         Q.      You don't recall ever asking

16 that?

17         A.      I don't recall asking that.

18         Q.      Are you aware of any sealed plan

19 or drawing showing alterations to the 1995

20 building?

21         A.      I'm not aware of any.

22         Q.      Do you know who was responsible

23 for securing a building permit for the work

24 shown on Exhibit 125?

B91

106

MICHAEL A. WILLIAMS

        MR. HILL:  Object to the form of

    the question.

BY MR. PINGITORE:

        Q.      To your understanding, would the

work depicted on Exhibit 125 require the

issuance of a building permit?

        A.      That I couldn't answer.

        Q.      With respect to the 1995 project,

who to your understanding was responsible for

securing building permits?

        A.      Lighthouse Construction.

        Q.      And to your knowledge, did

Lighthouse Construction secure a building

permit for the 1999 project?

        A.      I don't have explicit knowledge,

but I assume that there was one issued.

        Q.      Was East Coast involved at all

with the securing of building permits for the

1999 project?

        A.      No.

        Q.      Did Lighthouse ever ask East

Coast for specific documents from O'Donnell

Naccarato in the course of securing building

permits for the 1999 project?

B82

MICHAEL A. WILLIAMS

A.      Yes.

Q.      What documents did Lighthouse request of O'Donnell Naccarato through East Coast?

A.      They requested the -- all the structural plans showing, you know, the '99 building, from foundation plan to roof framing plan to building sections.

Q.      And did East Coast facilitate getting those plans from O'Donnell Naccarato to Lighthouse?

A.      Yes.

Q.      Was that you personally that was involved with that process?

A.      I don't think it was me personally.

Q.      Who would that have been?

A.      It could have been a number of people in my office.  I'm not sure specifically who.

Q.      Would you consider the work depicted in Exhibit 125 to be structural in nature?

A.      I guess that's a fair statement,

B83

MICHAEL A. WILLIAMS

1   yes.

2           Q.      Was there ever a request by

3   Lighthouse through you to get a sealed document

4   showing the structural modifications depicted

5   in Exhibit 125?

6           A.      Not --

7                   MR. HILL:  Object to the form of

8           the question.

9   BY MR. PINGITORE:

10          Q.      You can answer it.

11          A.      Not to my knowledge.

12          Q.      The structural modifications

13  shown on Exhibit 125, they were actually

14  performed by East Coast, correct?

15          A.      Yes.

16          Q.      And can you just walk me through

17  the modification that's depicted in Exhibit 125

18  in terms of how you would accomplish the work.

19          A.      We would have supplied the 8Z105

20  member that would span column to column as well

21  as the angle, 6 X 4 by 5/16, depicted under it.

22  Those angles were field welded to the existing

23  columns.  The new purlin was field welded to

24  the new angle.  Then the purlin was screwed to

B84

MICHAEL A. WILLIAMS

the low flutes of the roof deck.  That's pretty much the sequence of events.

Q.    And where the new purlin was screwed to the roof deck, would there be any preparation work required at the roof deck level, or was all of the work completed on the underside of the roof deck?

A.    All completed from underneath.

Q.    Would that screw then that connects the top, I'll call it flange of the purlin to the roof deck, penetrate the roof deck itself?

A.    Yes.

Q.    And then the lower flange of the purlin was welded, if I understand it correctly?

A.    That's correct.

Q.    As of today, do you hold any opinions regarding the cause of the collapse at issue in this litigation?

A.    No.

Q.    Do you hold any opinions regarding the weight of snow, ice or water on the roof immediately prior to the collapse?

MICHAEL A. WILLIAMS

1        A.      Do I hold an opinion to the

2   weight of the snow, is that what you asked me?

3        Q.      Yeah.  I want to know if you hold

4   any opinions regarding the weight of the snow,

5   ice and/or water on the roof immediately prior

6   to the collapse.

7        A.      Not an opinion, no.

8        Q.      Do you hold -- do you have some

9   type of an understanding as to the weight?

10        A.      More or less that it was

11   excessive.

12        Q.      And how would you define

13   excessive?

14        A.      I'm not sure.  It was pretty much

15   a one-in-100-year storm or something, and there

16   was very excessive snow on this roof.

17        Q.      Can you express your belief

18   regarding the weight in terms of pounds per

19   square foot or pounds per lineal foot or any

20   other type of measurement?

21        A.      No, I can't.

22        Q.      Has anyone shared with you their

23   opinion regarding the cause of the collapse?

24        A.      Not specifically.

B86