Exhibit "K"

```
 1            UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF DELAWARE
 3    - - - - - - - - - - - - - - - - - - - -x
      FEDERAL INSURANCE        : CIVIL ACTION
 4    COMPANY a/s/o            :
      EZIBA.COM./AVACET,       : NO. 04-339
 5    INC., EZIBA             :
      SECURITIES CORP.,        :
 6            Plaintiff(s),    :         ORIGINAL
              v.               :
 7    LIGHTHOUSE              :
      CONSTRUCTION, INC.,      :
 8    BECKER MORGAN GROUP,     :
      INC., and O'DONNELL,     :
 9    NACCARATO &             :
      MACINTOSH, INC.,         :
10            Defendant(s).    :
      - - - - - - - - - - - - - - - - - - - -x
11    MILLERS CAPITAL         : CIVIL ACTION
      INSURANCE COMPANY        :
12    a/s/o DEL-HOMES          : NO. 04-1322-JJF
      CATALOG GROUP, LLC,      :
13            Plaintiff(s),    :
              v.               :
14    LIGHTHOUSE              :
      CONSTRUCTION, INC.,      :
15    BECKER MORGAN GROUP,     :
      INC., and O'DONNELL,     :
16    NACCARATO &             :
      MACINTOSH, INC.,         :
17            Defendant(s)     :
      and                     :
18    LIGHTHOUSE              :
      CONSTRUCTION, INC.,      :
19            Defendant and   :
              Third-Party      :
20            Plaintiff,       :
              v.               :
21    EAST COAST ERECTORS,     :
      INC.,                   :
22            Third-Party      :
              Defendant.       :
23    - - - - - - - - - - - - - - - - - - - -x
24
```

B87

213

1                    Continued deposition of

2    ROBERT MacINTOSH, held at the law offices

3    of CHRISSINGER & BAUMBERGER, 3 Mill Road,

4    Suite 301, Wilmington, DE 19806, on

5    Monday, May 2, 2005, beginning at 9:45

6    a.m., on the above date, before Debra J.

7    Weaver, a Federally Approved RPR, CRR,

8    CSR of NJ (No. XI 01614) and Delaware

9    (No. 138-RPR, Expiration 1/31/08), and a

10   Notary Public of New Jersey, Pennsylvania

11   and Delaware.

12

13

14

15

16

17

18

19

20

21

22            ESQUIRE  DEPOSITION  SERVICES

             1880 John F. Kennedy Boulevard

23                  15th Floor

           Philadelphia, Pennsylvania 19103

24                (215) 988-9191

              Esquire Deposition Services

B88

ROBERT MacINTOSH

A.      That's correct.

Q.      Okay.  Did you understand not only that East Coast Erectors but Lighthouse Construction, the owner, anyone else who was involved, was relying on O'Donnell, Naccarato & MacIntosh, as the design engineers, to analyze the drift condition and come up with a solution that's represented by this document?

A.      Yes, I understood that.

Q.      And you would agree with me that neither you nor anyone else you have talked to expected Mr. Mike Williams or anyone else at East Coast Erectors to either contribute to or come up with a solution for the drift problem?

A.      No.  There was no responsibility on them to do any of the analyses.

What we have done, I guess, and what some of the things that we've talked about, is that we have such a good relationship with East Coast Erectors

B89

ROBERT MacINTOSH

that at different times we may rely on each other to -- for convenience only, to make observations for the other one.

I mean, we've -- over the years, we have just such an integrated relationship, and that's probably the reason why we would rely on some of the feedback from Mike on such things as the general compliance for the existing building to the drawings.

But the responsibility for the analysis of the drifting and for making recommendations with regards to the drifting were our responsibility.

Q.    If there is a problem with the design that's reflected in this Exhibit 66, Eziba 0018, you would not blame East Coast Erectors for any of that, would you?

A.    No.

Q.    Okay. There is one document in your files. It was marked as an exhibit somewhere in this deposition, but I don't know if I could lay my hands on

Esquire Deposition Services

B90

Exhibit "L"



1
2
3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
- - - - - - - - - - - - - - - - - - - - x

FEDERAL INSURANCE          : CIVIL ACTION
4   COMPANY a/s/o
EZIBA.COM./AVACET,         : NO. 04-339
5   INC., EZIBA SECURITIES   :
CORP.,                      :
6          Plaintiff(s),    :
v.                          :
7   LIGHTHOUSE               :
CONSTRUCTION, INC.,         :
8   BECKER MORGAN GROUP,     :
INC., and O'DONNELL,        :
9   NACCARATO & MACINTOSH,   :
INC.,                       :
10          Defendant(s).   :
- - - - - - - - - - - - - - - - - - - - x
11  MILLERS CAPITAL          : CIVIL ACTION
INSURANCE COMPANY           :
12  a/s/o DEL-HOMES          : NO. 04-1322-JJF
CATALOG GROUP, LLC,         :
13          Plaintiff(s),   :
v.                          :
14  LIGHTHOUSE               :
CONSTRUCTION, INC.,         :
15  BECKER MORGAN GROUP,     :
INC., and O'DONNELL,        :
16  NACCARATO & MACINTOSH,   :
INC.,                       :
17          Defendant(s)    :
and                         :
18  LIGHTHOUSE               :
CONSTRUCTION, INC.,         :
19          Defendant and   :
Third-Party                 :
20          Plaintiff,      :
v.                          :
21  EAST COAST ERECTORS,     :
INC.,                       :
22          Third-Party     :
Defendant.                  :
23  - - - - - - - - - - - - - - - - - - - - x
24

B91

2

1           Oral deposition of MICHAEL A.

2  WILLIAMS, held at the law offices of WETZEL &

3  ASSOCIATES, P.A., The Carriage House, Suite

4  201, 1100 North Grant Avenue, Wilmington,

5  Delaware, 19805, on Tuesday, June 14, 2005,

6  beginning at 9:25 a.m., on the above date,

7  before Debra J. Weaver, a Federally Approved

8  RPR, CRR, CSR of NJ (No. XI 01614) and Delaware

9  (No. 138-RPR, Expiration 1/31/08), and a Notary

10  Public of New Jersey, Pennsylvania and

11  Delaware.

12

13

14

15

16

17

18

19

20

21

22        ESQUIRE DEPOSITION SERVICES

          1880 John F. Kennedy Boulevard

23               15th Floor

         Philadelphia, Pennsylvania 19103

24             (215) 988-9191

B92

60

MICHAEL A. WILLIAMS

1  Naccarato's structural evaluation of the 1995

2  building?

3       A.     No.

4       Q.     Do you recall Mr. Anastasi's

5  testimony regarding a request that he made to

6  you in order to ascertain certain measurements

7  related to the 1995 building?

8       A.     Vaguely.

9       Q.     From his deposition testimony?

10       A.     Yes.

11       Q.     Is that consistent with your

12  recollection?

13       A.     I believe so.

14       Q.     Can you give me the benefit of

your recollection regarding what type of

information Mr. Anastasi requested from you

personally in the context of evaluating the

1995 building?

     A.     Could you repeat that again.

     MR. PINGITORE:  Maybe -- can you

read that back.

     (Whereupon, the court reporter

read back from the record.)

     THE WITNESS:  I believe he

B93

MICHAEL A. WILLIAMS

1          wanted -- I'm not sure of the time

2          frame of when these drawings were

3          submitted to him, the Varco-Pruden

4          drawings, but I believe he wanted

5          those.   I believe he asked us to verify

6          the joist spacings at the location of

7          where the two buildings tied together,

8          and possibly verify some depths of

9          certain members, columns and wall

10         beams.

BY MR. PINGITORE:

12         Q.     And do you recall securing the

measurements that Mr. Anastasi requested and

then providing them to him?

15         A.     Yes.

16         Q.     Was that work that you delegated

to someone or that you performed personally?

18         A.     I delegated it.

19         Q.     Do you remember who you delegated

it to?

21         A.     My brother, Tom Williams.

22         Q.     Was there any reason why Mr.

Anastasi couldn't secure that information for

himself?

B94

MICHAEL A. WILLIAMS

A.      Not to my knowledge.

Q.      Was it typical in your relationship with O'Donnell Naccarato for them to rely on East Coast to make certain observations at the field level?

A.      I wouldn't call it typical.

Q.      Had it occurred before?

A.      Not to my knowledge.

Q.      Were you comfortable in securing those measurements for Mr. Anastasi?

A.      Yes.

Q.      Did you have an understanding at that point that Mr. Anastasi had not visited the 1995 building?

A.      I don't think I can say that he specifically did not visit it.  I don't recall him visiting the site with me.  I can't recall if he did it on his own.

Q.      At any point in your retention of O'Donnell Naccarato's services for the 1999 project, did you ask that they perform an actual site visit to evaluate the 1995 building?

A.      I don't believe so.

B95

63

MICHAEL A. WILLIAMS

1          Q.      Is there a reason why that

2    specific task wasn't requested of O'Donnell

3    Naccarato?

4          A.      No specific reason.

5          Q.      Is your best recollection that

6    there was one conversation between you and Mr.

7    Anastasi regarding his need for you to secure

8    field measurements?

9               MR. HILL:  Object to the form of

10         the question.

11              MR. PINGITORE:  You can answer.

12              THE WITNESS:  Was there at least

13         one, is that your question?

14   BY MR. PINGITORE:

15         Q.      Was there just one is my

16   question.

17              MR. PINGITORE:  Same objection.

18              MR. HILL:  Same objection.

19              THE WITNESS:  There could have

20         been more, but I know there was at

21         least one.

22   BY MR. PINGITORE:

23         Q.      Do you recall if there were ever

24   any actual modifications to the 1995 building

B96

Exhibit "M"

**CATALOG RESOURCES BUILDING EXPANSION – ENTERPRISE BUSINESS PARK**

Structural Steel, Joist, Decking & Siding Contract

BUILDING DESCRIPTION

1.    Building is 250,000 sq. ft.

2.    Building is an "L" shape. It will attach to an existing pre-engineered metal building (Varco-Pruden) along column line 1.

3.    Framing for building is a single slope. Interior bays are 50' x 50'. Roof pitch is a minimum of 1/8" rise for 12" run. Loading for building is 30 PSF live load, 90 MPH wind load, and a 10 PSF collateral loading for sprinkler, heating, ventilating and electrical systems. Minimum clear height under framing is 24'-0", this is critical, and must be maintained. *Possibly ⅛ w/ADHeLeD*

4.    Framing for building is the following:

    Box 1 – Column Line 1-11 (500') x Column line A-E (200')
    Box 2 – Column Line E-Q (600') x Column line 6-11 (250')
    A.    High Eave on Box 1 is column line E, on Box 2 high eave is column line 6. They are to match in elevation.
    B.    At column line Q, this will be parapeted to match eave along above.
    C.    Design is to include framing support/base for parapets along column line 1-A to E and column line E-6 to 11. Framing will be 8" structural metal suds (by others) bearing on steel provided by this contract. The parapets will allow for roof height difference and expansion.
    D.    Exterior wall is 12" CMU to 12' – 0" AFF, with 26 ga., *steel/metal siding from top of masonry to top of parapet/eave.
    E.    Roof system is a ballasted, single ply membrane, with insulation, and sixty five 4'x8' skylight/smoke vents.

WORK TO BE INCLUDED

1.    Structural design (steel & concrete foundation) complete, and coordination with architect in completing design. Architect is BM2OR, Ernie Olds.

2.    Furnish all labor, material, equipment, tools and supervision to complete the following:
    *A.    Structural steel, joist, and decking for 250,000 sq. ft. warehouse complete.
    B.    Structural steel, joist, deck and edging for mezzanine to be located in area bound by column line 3-4/D-E. Overall dimension is 39"-4"x50'-8". Total loading is 175 psf.
    C.    Existing pre-engineered metal building will require additional support for snow loading, caused by addition. Include this work.
    D.    Misc. metals – Will include furnishing and/or installing: *Q*
        -    Framing for roof access hatch, and ladder with cage located in the following areas: Mezzanine, and bathroom office at column line②11.
        -    Framing for 65 each 4"x8" skylight/smoke vents. ✓
        -    Canopy framing & decking at shipping & receiving office. One canopy is 5'x32' ✓ and one is 5'x12'.
        -    Lintels ✓
        *    Beam w/ plate to support 2' of 12" CMU, at 18 each 10'x10' OH doors.

*ASSUME    3000# SOIL BELEING*



EXHIBIT
Williams-118
DEBRA J. WEAVER
6-14-05

ECE0575

B97

Catalog Resources Building Expansion – Enterprise Business Park
February 8, 1999
Page Two

E.    Miscellaneous Metals Continued
- Lintels
- *Beam w/plate to support 4' of 12" CMU, at 2 each 8'x8' OH doors.
- *Beam w/plate to support 4'-8' of 12" CMU, at 4 each 6'x4' windows. Wall will also support mezzanine joist above.
- Dock leveler curb angle. Pit is 7'x8' and is to include bumper mounting angle (Item 4) and Dok-Lok mounting plate (Item 5). Include with base bid twelve (12) each with alternate add; per each.
- Stair w/landing to mezzanine (Metal pan w/concrete). EXTERIOR
- Allowance for hand rails at exterior stairs

    * 4 each would be "L" shape
    * 1 each would be straight w/run on each side max. height is 48" from FF to grade.

F.    Metal siding, insulation, and trim, from top of CMU to top of parapet/eave, including all framing required for metal siding installation. Allow for 10 ea. 4'x4' wall openings for louver/fan; 4 ea. 6'x4' window opening on 2nd floor of mezzanine, include framing and trim. Copings and eave trim is by roofer. Provide 3 ½" (R-13) vinyl reinforced HD insulation.

Quotes are due back on 2/23/99 with an award by 2/26/99. In quote, please provide the following dates:

|     |                                    | Start    | Complete |
| --- | ---------------------------------- | -------- | -------- |
| 1.  | Design for foundation and structure | 3/1/99   | 3/12/99  |
| 2.  | Fabrication                        | 3/12/99  | 4/30/99  |
| 3.  | Erection of steel                  | 5/3/99   | 6/15/99  |
| 4.  | Siding                             | 5/24/99  | 7/7/99   |
| 5.  | Miscellaneous metals               | 6/14/99  | 6/30/99  |

*Base dates upon award being made on February 26, 1999. Soils borings are completed and will be forwarded to contractor. The above completion dates will bear serious consideration in award of contract.

Alt. Bid to prime joist & deck white

ECE0576

B98

```
 1           UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF DELAWARE
 3    ---------------------x
      FEDERAL INSURANCE        : CIVIL ACTION
 4    COMPANY a/s/o            :
      EZIBA.COM./AVACET,       : NO. 04-339
 5    INC., EZIBA SECURITIES   :
      CORP.,                   :
 6          Plaintiff(s),      :
            v.                 :
 7    LIGHTHOUSE               :       ORIGINAL
      CONSTRUCTION, INC.,      :
 8    BECKER MORGAN GROUP,     :
      INC., and O'DONNELL,     :
 9    NACCARATO & MACINTOSH,   :
      INC.,                    :
10          Defendant(s).      :
      ---------------------x
11    MILLERS CAPITAL          : CIVIL ACTION
      INSURANCE COMPANY        :
12    a/s/o DEL-HOMES          : NO. 04-1322-JJF
      CATALOG GROUP, LLC,      :
13          Plaintiff(s),      :
            v.                 :
14    LIGHTHOUSE               :
      CONSTRUCTION, INC.,      :
15    BECKER MORGAN GROUP,     :
      INC., and O'DONNELL,     :
16    NACCARATO & MACINTOSH,   :
      INC.,                    :
17          Defendant(s)       :
      and                      :
18    LIGHTHOUSE               :
      CONSTRUCTION, INC.,      :
19          Defendant and      :
            Third-Party        :
20          Plaintiff,         :
            v.                 :
21    EAST COAST ERECTORS,     :
      INC.,                    :
22          Third-Party        :
            Defendant.         :
23    ---------------------x
24
```

2

1         Oral deposition of MICHAEL A.

2   WILLIAMS, held at the law offices of WETZEL &

3   ASSOCIATES, P.A., The Carriage House, Suite

4   201, 1100 North Grant Avenue, Wilmington,

5   Delaware, 19805, on Tuesday, June 14, 2005,

6   beginning at 9:25 a.m., on the above date,

7   before Debra J. Weaver, a Federally Approved

8   RPR, CRR, CSR of NJ (No. XI 01614) and Delaware

9   (No. 138-RPR, Expiration 1/31/08), and a Notary

10  Public of New Jersey, Pennsylvania and

11  Delaware.

12

13

14

15

16

17

18

19

20

21

22       ESQUIRE DEPOSITION SERVICES

      1880 John F. Kennedy Boulevard

23         15th Floor

     Philadelphia, Pennsylvania 19103

24        (215) 988-9191

B100

MICHAEL A. WILLIAMS

1   specific point in time that there was a

2   realization of the need to remove downspouts

3   and install interior drains?

4           A.      I think it was generally

5   understood.

6           Q.      Do you know who was responsible

7   for that work?

8           A.      I do not.

9           Q.      Do you know if O'Donnell

10  Naccarato was made aware of the need to remove

11  downspouts and add interior drains in the

12  context of providing engineering services to

13  East Coast?

14          A.      I do not.

15          Q.      I just want to go over a few

16  documents.

17                  (Whereupon, Deposition Exhibit

18          No. Williams-118, Scope of Work, Bates

19          ECE 0575-0576, was marked for

20          identification.)

21  BY MR. PINGITORE:

22          Q.      Let me show you a two-page

23  document marked as 118.  It's previously Bates

24  stamped as ECE 0575 and 0576.  Could you take a

B101

MICHAEL A. WILLIAMS

1    moment to review that document, and when you

2    get a chance, please identify it for the

3    record.

4          A.       This looks like the scope of work

5    submitted to me by Lighthouse Construction for

6    purposes of bidding the project.

7          Q.       And this would then be the scope

8    of work that you provided to O'Donnell

9    Naccarato in order to provide engineering

10   services?

11         A.       That's correct.

12         Q.       On the second page of the

13   document, there are some dates handwritten in.

14   Do you see that?

15         A.       Yes.

16         Q.       Is that your handwriting?

17         A.       Yes.

18         Q.       And can you tell me the

19   significance of those dates, please?

20         A.       If I recall, they're nothing but

21   milestone dates.

22         Q.       Just a general schedule as to

23   when you would hope to complete the work?

24         A.       Yes.

B102

68

MICHAEL A. WILLIAMS

1          Q.        Within the dates shown on the

2   second page, when would the modifications to

3   the 1995 building occur?

4          A.        I believe they were done sometime

5   prior to June 4th.

6          Q.        And what causes you to single out

7   that date?

8          A.        From reviewing our time sheets.

9          Q.        Were you able to narrow it down

10  any further?

11         A.        Can I correct that?  Did I say

12  July 4th?

13         Q.        No.  June 4th?

14         A.        It is June 4th.

15         Q.        So the modifications to the 1995

16  building were completed prior to June 4, 1995,

17  correct?

18         A.        Yes.

19         Q.        And do you know the date after

20  which they were completed, like a window?

21              MR. HILL:  I'm sorry.  I object

22         to the form of the question.

23              MR. PINGITORE:  That wasn't a

24         great question.

B103

69

MICHAEL A. WILLIAMS

1              MR. HILL:  Can you rephrase that?

2    BY MR. PINGITORE:

3         Q.       Can you provide me with just a

4    general window as to when the modifications to

5    the 1995 building were completed?

6         A.       It would only be an estimate, but

7    I would have to say within probably two weeks

8    prior to June 4th.

9         Q.       If we go back to page one, the

10   scope of work, under work to be included, 2-C

11   reads, "Existing pre-engineered metal building

12   will require additional support for snow

13   loading, caused by addition.   Include this

14   work."  Is that the portion of the scope of

15   work that caused you to ask O'Donnell Naccarato

16   to evaluate the 1995 building?

17        A.       It could be.  This doesn't

18   specifically tell me that I'm responsible for

19   engineering in that sentence, but it could be

20   the sentence that caused me to ask them to

21   include this work.

22        Q.       Are you aware of any other

23   documents that asked East Coast to include an

24   evaluation of the 1995 building as part of its

B104

MICHAEL A. WILLIAMS

1    services?

2        A.      No.

3        Q.      I'm just going to show you

4    another two-page document.  It's previously

5    Bates stamped ECE 0573 and ECE 0574.  Take a

6    minute to review the document, and when you're

7    prepared, please identify it for the record.

8    And then we'll have this document marked as

9    Exhibit 119.

10               (Whereupon, Deposition Exhibit

11          No. Williams-119, Proposal from ONM to

12          East Coast dated 2/18/99, Bates ECE

13          0573-0574, was marked for

14          identification.)

15   BY MR. PINGITORE:

16       Q.      Do you recognize this document?

17       A.      Yes.

18       Q.      Can you identify it for us,

19   please?

20       A.      It appears to be the proposal

21   from O'Donnell Naccarato MacIntosh to East

22   Coast Erectors for the engineering services for

23   the 1999 building.

24       Q.      And it's dated February 18, 1999,

B105

Exhibit "N"

**112.3.1 Fee schedule:** A fee for each plan examination, building permit and inspection shall be paid in accordance with the following schedule.

[JURISDICTION TO INSERT APPROPRIATE SCHEDULES.]

**112.4 Accounting:** The code official shall keep an accurate account of all fees collected; and such collected fees shall be deposited monthly in the jurisdiction treasury, or otherwise disposed of as required by law.

**112.5 Refunds:** In the case of a revocation of a permit or abandonment or discontinuance of a building project, the portion of the work actually completed shall be computed and any excess fee for the incompleted work shall be returned to the permit holder upon *written* request. All plan examination and permit processing fees and all penalties that have been imposed on the permit holder under the requirements of this code shall first be collected.

### SECTION 113.0 INSPECTION

**113.1 Preliminary inspection:** Before issuing a permit, the code official shall, if deemed necessary, examine or cause to be examined all buildings, structures and sites for which an application has been filed for a permit to construct, enlarge, *alter*, repair, remove, demolish or *change the occupancy* thereof.

**113.2 Required inspections:** After issuing a building permit, the code official shall conduct inspections from time to time during and upon completion of the work for which a permit has been issued. A record of all such examinations and inspections and of all violations of this code shall be maintained by the code official. The *owner* shall provide for *special inspections* in accordance with Section 1705.0.

**113.2.1 Approved inspection agencies:** The code official shall accept reports of *approved inspection agencies*, provided such agencies satisfy the requirements as to qualifications and reliability.

**113.2.2 Plant inspection:** Where required by the provisions of this code or by the *approved rules*, materials or assemblies shall be inspected at the point of manufacture or fabrication in accordance with Section 1703.3.

**113.3 Final inspection:** Upon completion of the building or structure, and before issuance of the certificate of occupancy required by Section 118.0, a final inspection shall be made. All violations of the approved *construction documents* and permit shall be noted and the holder of the permit shall be notified of the discrepancies.

**113.4 Right of entry:** The code official shall have the authority to enter at any reasonable time any *structure* or premises for which a permit has been issued but has not received a certificate of occupancy in accordance with Section 118.0.

For all other *structures* or premises, when the code official has reasonable cause to believe that a code violation exists, the code official is authorized to enter the structure or premises at reasonable times to inspect subject to constitutional restrictions on unreasonable searches and seizures. If entry is refused or not obtained, the code official is authorized to pursue recourse as provided by law.

**113.5 Coordination of inspections:** Whenever in the enforcement of this code or another code or ordinance, the responsibility of more than one code official of the jurisdiction is involved, it shall be the duty of the code officials involved to coordinate their inspections and administrative orders as fully as practicable so that the *owners* and occupants of the structure shall not be subjected to visits by numerous inspectors or multiple or conflicting orders. Whenever an inspector from any agency or department observes an apparent or actual violation of some provision of some law, ordinance or code not within the inspector's authority to enforce, the inspector shall report the findings to the code official having jurisdiction.

### SECTION 114.0 PROFESSIONAL ARCHITECTURAL AND ENGINEERING SERVICES

**114.1 General:** The *construction documents* for new construction, *alteration*, repairs, expansion, *addition* or modification for buildings or structures shall be prepared by a *registered design professional*. All *construction documents* required for a building permit application shall be prepared by a *registered design professional* consistent with the professional registration laws of the state in which the project is to be constructed. The *construction documents* shall include the name and address of the *registered design professional* and shall be signed, sealed and dated by the *registered design professional* in accordance with the professional registration laws of the state in which the project is to be constructed.

**114.2 Special inspections:** *Special inspections* shall be made in accordance with Section 1705.0.

**114.2.1 Building permit requirement:** This *special inspection* requirement shall be determined prior to the issuance of the building permit and shall be a requisite for the permit issuance as described in Section 1705.0.

**114.2.2 Fees and costs:** All fees and costs related to the performance of special professional services shall be borne by the *owner*.

### SECTION 115.0 WORKMANSHIP

**115.1 General:** All work shall be conducted, installed and completed in a workmanlike and acceptable manner so as to secure the results intended by this code.

### SECTION 116.0 VIOLATIONS

**116.1 Unlawful acts:** It shall be unlawful for any person, firm or corporation to erect, construct, *alter*, extend, repair, remove, demolish or occupy any building, structure or equipment regulated by this code, or cause same to be done, in conflict with or in violation of any of the provisions of this code.

**116.2 Notice of violation:** The code official shall serve a notice of violation or order on the person responsible for the erection, construction, *alteration*, extension, repair, removal, demolition or occupancy of a building or structure in violation of the provisions of this code, or in violation of a detail statement or a plan approved thereunder, or in violation of a permit or certificate issued under the provisions of this code. Such order shall direct the discontinuance of the illegal action or condition and the abatement of the violation.